AMERICAN CYANAMID COMPANY, Plaintiff,

v.

S.C. JOHNSON & SON, INC., Defendant.

Civ. A. No. 89–1858.

United States District Court, D. New Jersey.

Aug. 30, 1989.

Carpenter, Bennett & Morrissey by David M. McCann, Newark, N.J., for plaintiff; Pennie & Edmonds, Berj A. Terzian, Philip T. Shannon and Jonathan E. Moskin, New York City, of counsel.

Hellring Lindeman Goldstein Siegal Stern & Greenberg by Jonathan L. Goldstein, Newark, N.J., for defendant.

BISSELL, District Judge.

Presently before the Court is plaintiff American Cyanamid Company's (American Cyanamid) motion for a preliminary injunction restraining defendant S.C. Johnson & Son, Inc. (S.C. Johnson) from using the designation MAX or any other designation which allegedly infringes on plaintiff's MAXFORCE trademark for insecticides. In this Opinion, the Court will not address all factual and legal issues raised in the extensive papers and arguments of the parties, only those material to its decision. Rest assured, however, that no issue not specifically addressed here has been ignored or overlooked in the Court's review of the record.

Plaintiff filed its complaint on April 28, 1989 alleging the following causes of action:

1. Federal trademark infringement (Count One);

2. False designations of origin and false descriptions and representations in

violation of 15 U.S.C. § 1125(a) (section 43(a) of the Lanham Act) (Count Two);

3. False and misleading advertising in violation of 15 U.S.C. § 1125(a) (section 43(a) of the Lanham Act) (Count Three);

4. Statutory and common law unfair competition (Count Four);

5. Dilution (Count Five); and

6. False advertising in violation of N.J.S.A. 56:8–2 (Count Six).

The primary purpose of a preliminary injunction is to preserve the status quo pending final determination of the action after a full hearing. *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1150 (3d Cir.1982). The Third Circuit has consistently applied a four-part test in analyzing such applications for injunctive relief: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of such relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest." *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985); *Klitzman, Klitzman and Gallagher v. Krut*, 744 F.2d 955, 958–59 (3d Cir.1984). A plaintiff must establish both items (1) and (2) above in order to obtain a preliminary injunction.

*Likelihood of Success*

■ Title 15 U.S.C. § 1114(1)(a) (section 32(1)(a) of the Lanham Act) provides:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

On March 27, 1984, the name "MAX-FORCE" became a registered trademark in the Principal Register of the United States Patent and Trademark Office. (Plaintiff's Exh. 1). The Principal Register notes that the trademark is for "Insecticide" and that it was first used and placed into commerce on November 13, 1981. (*Id.*)

Title 15 U.S.C. § 1065 (section 15 of the Lanham Act) provides in pertinent part that:

... the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable....

Title 15 U.S.C. § 1115(b) (Section 33(b) of the Lanham Act) provides in pertinent part:

If the right to use the registered mark has become incontestable under section 1065 of this title [15 USCS § 1065], the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065 [15 USCS § 1065]....[1]

(Footnote added).

It is undisputed that pursuant to plaintiff's "Combined Sections 8 & 15 Affidavit" filed with the United States Patent and Trademark Office on April 19, 1989, plaintiff has the exclusive right to "MAX-FORCE" in connection with the sale of insecticides. (*See* Plaintiff's Exh. 29). The trademark "MAXFORCE" is presently being used on roach and ant baits. Insofar as "MAXFORCE" is registered on the Principal Register and is incontestable, it is unnecessary for this Court to evaluate whether the trademark has achieved "secondary meaning." *See Aloe Creme Laboratories, Inc. v. Aloe 99, Inc.*, 485 F.2d 1241, 1242 (C.C.P.A.1973). The issue before this Court in determining the likelihood of success of plaintiff's claims for trademark infringement and unfair competition is the prospect of consumer confusion as to the source of the product. This Court has clar-

---

**1.** Sections 1065 and 1115(b) contain exceptions which are not pertinent here.

ified the term "consumer confusion" in *National Football League Properties, Inc. v. New Jersey Giants*, 637 F.Supp. 507, 516 (D.N.J.1986):

> In order to be confused, a consumer need not believe that a plaintiff actually produced a defendant's merchandise and placed it on the market. Rather, a consumer's belief that a plaintiff sponsored or otherwise approved the use of the mark satisfies the confusion requirement.

■ The Third Circuit has enumerated the following factors which are to be considered by a court in determining the likelihood of confusion in an action for trademark infringement and unfair competition: (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of [the] owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Scott Paper Company v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978) (citing 439 F.Supp. 1022, 1036–37); *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 823–24 (D.N.J.1980). While these factors are helpful in determining the likelihood of confusion, the Third Circuit has stated that they need not all be considered "when some are dispositive." *Freixenet, S.A., et al. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151–52 (3d Cir. 1984).

### 1. Similarity Between the Marks

■ The similarity of the marks is determined by "the overall impression created by the mark as a whole rather than simply comparing individual features of the marks." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983) (quoting *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 504–05 (5th Cir.1980)). This consideration includes a comparison of the appearance, sound and meaning of the marks, as well as the manner in which the marks are used. *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 824 (D.N.J.1980).

■ Plaintiff suggests that this Court must compare the similarity of trademark "MAXFORCE" with the term "Max" rather than the term "Raid Max" for the reason that the "Max" logo dominates the defendant's packaging and advertisements. (Memo. in Supp. at 49). Plaintiffs point to some of the defendant's advertisements which include such phrases as: "WHEN MAX ATTACKS, YOU WIN" (Pl. Exhs. 44–46); "MAX IS COMING" (Pl. Exh. 62); and "MAX IS HERE" (*Id.*). The Court notes that with the exception of the advertisement shown in plaintiff's Exhibit 62, the product name is described in the advertisements as "Raid Max." In its Reply Memorandum, plaintiff also points to a newspaper article from the Racine Journal Times, April 26, 1989 which is captioned "Max Chemicals, Marketing New" and which refers to the new product line as "Max." (*See* Pl. Exh. 71). Defendant urges, however, that the article itself is accompanied by a picture containing a sign with the words "Raid Max." Additionally, defendant points out that the author of the article refers to its product as "Max" only after referring to the new product line as "Raid Max." (*See* Georgeson Surreply Aff., Exh. A). Defendant also refers the Court to the article entitled " 'Johnson Wax' New Raid Has Potent New Chemicals" published in the July 1989 edition of "Pest Control" magazine which refers repeatedly to defendant's new line of products as "Raid Max." (Pl. Exh. 75). The Court takes judicial notice that one of de-

fendant's television advertisements refers to its new product line as "Raid Max," not merely "Max" although the commercial concludes with the phrase: "When MAX ATTACKS You WIN."

The defendant's affirmation of Patrick E. Boland provides in pertinent part that Johnson has registered trademarks in the mark "RAID" but it has not applied for such registration for the terms "Max" or "Raid Max" (Affirm. of Patrick Boland, ¶¶ 2, 11). Mr. Boland further affirms that insofar as "Raid Max" is not being used as a trademark, no "TM" designation "has been used for the word "Max" on the packaging of the RAID Max products." [2] *Id.* at ¶ 12.

The Court has reviewed the advertisements described above, various photographs of defendant's packaging, and actual packages themselves. Although plaintiff is correct that "Max" is the dominant name on defendant's product, this Court must, in evaluating the similarity of the marks, consider that defendant has used the terms "Raid" and "Max" in combination. Consumer awareness studies submitted by Johnson for 1987 and 1989 show that consumer awareness of the "Raid" brand is at 99%. (Pritchard Aff., ¶ 5; *See* Johnson Exh. 67 at 1939 and Exh. 68 at 1936.) According to Beth Pritchard, Vice-President of Johnson, this statistic means that "virtually every adult householder recognizes and knows the RAID brand name." (Pritchard Aff., ¶ 5). The Court determines that the "Raid" name is a highly recognizable aspect of the name of defendant's product line.

■ In determining the similarity of the marks it is proper for the Court "to recognize that one feature of a mark is more significant than the other features and to give greater force and effect to that domi-

nant feature." *Burger Chef Systems, Inc., v. Sandwich Chef, Inc.,* 608 F.2d 875, 878 (C.C.P.A.1979). The Court disagrees with plaintiff's assertion that "MAX" is the dominant portion of its trademark. While the terms "MAX" and "FORCE" are set apart by different color lettering, the letters are nevertheless the same size boldface type. "MAX" simply does not stand out as the dominant word of the trademark. Cyanamid also contends that a consumer is likely to shorten the name "MAXFORCE" to "MAX", relying on *Blumenfeld Development Corporation v. Carnival Cruise Lines, Inc.,* 669 F.Supp. 1297, 1320 (E.D.Pa.1987) (inevitable that many persons would shorten "Carnival Club" to "Carnival"); *Trump v. Caesars World, Inc.,* 645 F.Supp. 1015, 1022 (D.N.J.1986) (many persons will shorten "Trump's Palace" to the "Palace"). The Court determines, however, that the abbreviation of a one word trademark such as "MAXFORCE" is unlikely.

The Court also finds that the visual impressions created by the marks *sub judice* are quite dissimilar. Plaintiff's mark uses block capital lettering: "MAXFORCE". The term "MAX" is in red lettering and "FORCE" is in black lettering with the exception of the letter "O" which is set apart in a distinctive black and red pinwheel pattern. The overall color scheme for plaintiff's packaging is black, red and white. The top left corner of the packaging contains the name "CYANAMID" in smaller, but highly visible, white block lettering which is set against a black background. (*See* Pl. Exhs. 4–6). Defendant's packaging contains the word "MAX" in large blue lowercase lettering, outlined by a thin black line. Directly above the word "Max" is the name "Raid" in smaller but vivid yellow lowercase lettering set against a black chevron pattern.[3] Depending upon

---

2. The Court notes that on the advertisements set forth in Plaintiff's Exhibits 44–46 the term "Raid Max" is followed by "TM".

   Defendant explains, however, in its Memorandum in Opposition that it was through inadvertence that two print ads were approved which contained a "TM" following the word "Max". Defendant contends that this error was correct-

ed and not repeated. (Memo in Opp. at 31 n. 30).

3. Beth Pritchard attests that
   [s]ince the introduction of its RAID products in 1956, Johnson has used a chevron device to serve as a background for the RAID mark. The mark RAID displayed, typically displayed in yellow within the chevron, has been uni-

the particular product, the name "Johnson Wax" is either directly above the chevron pattern, or on the top left of the packaging in smaller, but noticeable, lettering. The above described lettering is set against a silver background. (*See* Pritchard Aff., Exh. J; Pl. Exh. 65–68). The packaging, or trade dress, of plaintiff's and defendant's products is different and readily distinguishable even to the untrained eye of an average consumer.

It appears that plaintiff would have the court focus solely on defendant's use of the word "Max", as opposed to RAID Max, since it is the only similarity between the two marks. Defendant urges that this Court must not focus on its use of "Max" because, on its own, it is simply a descriptive term. Defendant relies in part on *American Cyanamid Corporation v. Connaught Laboratories, Inc.*, 800 F.2d 306 (2d Cir.1986) in which the Court concluded that defendant's use of the name "HibVAX" did not infringe on the registered trademark "HIB–IMUNE" stating in pertinent part:

> A trademark holder cannot appropriate generic or descriptive terms for its exclusive use, and a trademark infringement finding thus cannot be based on the use of a generic or descriptive term such as 'Hib.' *See, e.g., Flintkote Co. v. Tizer*, 266 F.2d 849, 852 (3d Cir.1959).... As a result, because the generic term 'Hib' may not be appropriated by Lederle for its exclusive use, any likelihood of confusion between HibVAX and HIB–IMMUNE, and any consequent finding of infringement, must be based on a similarity between the suffixes 'VAX' and 'IMMUNE.'

(800 F.2d at 308).

In *Flintkote Company v. Tizer*, 266 F.2d 849, 852 (3d Cir.1959) the court stated in pertinent part:

> In comparing 'Flextone' and 'Flexachrome', used for similar but non competitive plastic tile products, the court below properly pointed out that the common prefix 'flex' is descriptive and not

subject to exclusive appropriation for trademark purposes.... The completing syllables 'tone' and 'achrome' are dissimilar in appearances and are made only slightly similar in sound by the presence of a common long 'o'. We agree that on their face these two, when combined with 'flex', are not so confusingly alike as to require a conclusion that the one infringes the other....

(citations omitted).

*See also Schmid Laboratories v. Young Drug Products Corp.*, 482 F.Supp. 14 (D.N.J.1979) where Judge Fisher granted summary judgment to the defendant alleged infringer, determining that "Ribbed" did not infringe upon plaintiff's trademark "Sensi–Ribbed" due, *inter alia*, to the prominence of defendant's "Trojan" brand also on its package, despite the fact that the two products (unlike those in the case at bar) were sold side-by-side in the same retail outlets.

For the reasons set forth below, this Court determines that the term "Max" is simply a descriptive term. With the exception of defendant's use of the term "Max" there is no similarity between plaintiff's and defendant's marks.

### 2. Strength of the Mark

■ The strength of a mark refers to its inherent distinctiveness. The degree of protection to be afforded a mark depends on its strength or weakness. Defendant is correct in urging that descriptive terms are entitled to minimal protection under the Lanham Act. A descriptive term has been defined as one that "conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *See Abercrombie & Fitch Company v. Hunting World, Incorporated*, 537 F.2d 4, 11 (2nd Cir.1976), (quoting *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968)). A dictionary definition and a common use meaning of the term "Max" is "an abbreviation of

---

formly used on the packaging and in the advertising of the RAID line to the present time.

(Pritchard Aff., ¶ 4).

the word maximum". When viewed on its own, "Max" is simply a descriptive term.

■ In *Park 'n Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 205, 105 S.Ct. 658, 667, 83 L.Ed.2d 582 (1985) the Court concluded that

> the holder of a registered mark may rely on incontestability to enjoin infringement and that such an action may not be defended on the grounds that the mark is merely descriptive.

Plaintiff suggests that because it has an incontestible trademark in "MAXFORCE", defendant could not defend this action by asserting its descriptive nature. This argument is misplaced. Defendant uses only the descriptive term "Max" for which plaintiff does not claim trademark protection. Section 33(b) of the Lanham Act allows a trademark owner to assert the sole right to use only its exact mark. *Weil Ceramics and Glass Inc. v. Dash*, 11 U.S.P.Q.2d 1001, 1013, 878 F.2d 659 (3d Cir.1989). Accordingly, plaintiff may not assert that "Max" is protected by section 33(b) from being characterized as descriptive. Secondly, *Park'n Fly* involved (at the Supreme Court) a challenge to the *validity* of the mark. In the present action, no one challenges the validity of "MAXFORCE." *Park'n Fly* does not stand for the proposition that the *strength* of an admittedly valid mark may not be measured by characterizing it as descriptive in determining the issue of customer confusion. That issue was not before the Supreme Court. *See* 469 U.S. at 205, 105 S.Ct. at 667. The Ninth Circuit has expressly held that a mark, though incontestable, may also be found to be weak. *Miss World (UK) Ltd. v. Mrs. America Pageants*, 856 F.2d 1445 (9th Cir.1988) (noting that *Park'n Fly* does not preclude this result).

Defendant emphasizes the weakness of the term "Max" by showing that at the time plaintiff applied for registration of "MAXFORCE" in the PTO there were at least four other makers of insecticides using the term "MAX" as either a prefix or suffix to the mark:

(1) MAX–KILL (Registration, 1951; "Insecticides, Particularly Grain Fumigants");

(2) MAX SPOT KILL (Registration, 1952; "Insecticides, namely Fumigants for killing insects,");

(3) SIMAX (Registration, 1963; "Insecticides");

(4) PERMAX (Registration, 1968; "Insecticides").

(Boland Aff., ¶ 4). Defendant also has submitted a list of 1,937 applications and registrations in the PTO for marks on various types of goods which contain the term "Max". (Boland Aff., ¶ 8, Exh. 9.)

Plaintiff contends that this Court must not consider that "Max" is often used for products unrelated to the ones *sub judice*. Plaintiff relies in part on *Standard Brands Incorporated v. RJR Foods, Inc.*, 192 U.S. P.Q. 383 (1976), in which the Court in denying an application for trademark registration for the words "Cherry Royal" considered that:

> [t]here is no proof that the purchasing public that buys opposer's goods and would buy applicant's goods has been so conditioned by exposure to a plethora of "ROYAL" marks for the same or closely related goods in the market that customers have been educated to distinguish between different "ROYAL" marks on the basis of minute distinction.

*Id.* at 385–86. Plaintiff cites to a portion of the deposition testimony of James Allen, President of the company that owns the Max Kill trademark, in which Mr. Allen stated that MAXFORCE Products do not compete with Max Kill products and that the two product groups serve "entirely different markets." (Allen Dep. at 90–92).

■ Plaintiff does not claim that "Simax" or "Permax" are marks for non-similar products. In determining the likelihood of confusion, this Court may certainly consider that one word of a trademark has commonly been used for similar products. *See Armstrong Cork Company v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir.), *cert. denied*, 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979); *American Heritage Life Insurance Company v. Heritage Life*

*Insurance Company,* 494 F.2d 3, 13 (5th Cir.1974); *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445, 448 (5th Cir.1973). *See also Amstar Corporation v. Dominos Pizza, Inc.,* 615 F.2d 252, 259–60 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980) ("the greater the number of identical or more or less similar trade-marks (sic) already in use on different kinds of goods, the less is the likelihood of confusion") (quoting Rstmt. of Torts § 729, Comment 8 (1938)).

The Court concludes that the word "Max" is a weak element of the plaintiff's trademark.

### 3. Similarity of Goods, Trade Channels

Plaintiff's "MAXFORCE" product line consists of insecticide baits for small and large cockroaches and for "Pharaoh" ants. (Moore Aff., ¶ 5). Defendants concede that its products, sold under the name "Raid Max" are of the same nature as plaintiff's "MAXFORCE" products. (Memo in Opp. at 63). Defendant urges, however, that the respective products are sold in completely different trade channels "and that the American householders to whom Johnson markets RAID brand insecticides are so unaware of the existence of MAXFORCE, that there is not even the remotest possibility, let alone a likelihood, of confusion between MAXFORCE and RAID Max." (Memo in Opp. at 9).

"Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake or deception." *Ross Bicycles, Inc. v. East Coast Cycles, Inc.,* 224 U.S.P.Q. 725, 728 (N.D. Fla.1984), *aff'd Ross Bicycles, Inc. v. Cycles USA, Inc.,* 765 F.2d 1502 (11th Cir. 1985), *cert. denied* 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 306 (1986) (*citing Amstar Corp.,* 615 F.2d at 262). The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion. *Ross,* 224 U.S.P.Q. at 729; *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1368 (D.N.J.1981). Note that in *Elizabeth Taylor Cosmetics Co., Inc. v. An-*

*nick Goutal, S.A.R.L.,* 673 F.Supp. 1238 (S.D.N.Y.1987), upon which plaintiff places considerable reliance, the preliminary injunction was confined to "first-tier" retail stores, a limited marketing channel shared by both products. *Id.* at 1249.

Plaintiff sells its insecticides through a pest control distributor and a janitorial supply distributor. The janitorial supply distributor sells to maintenance staffs of commercial institutions such as office buildings, apartment complexes and hospitals. (Moore Aff., ¶ 8). The pest control distributor sells to pest control operators ("PCO"s or exterminators), public housing authorities and retail stores for do-it-yourself pest control. (*Id.*). According to Timothy Moore, Product Manager of the "MAXFORCE" line, "MAXFORCE bait trays are directly available to the consumer for over the counter purchase at PCO storefronts and small general stores in urban core areas sometimes known as 'bodegas.'" (*Id.* at ¶ 9).

Defendant's "RAID" products, including "Raid Max" are "sold to the public through the retail channel of trade, which consists of a variety of retail outlets, such as supermarkets, mass merchandisers (e.g., K–Mart, Walmart, Woolworths and Zayres), and also convenience stores, chain drug stores (such as Walgreen's) and other retailers ..." (Pritchard Aff., ¶ 8). Johnson does not sell any of its "RAID" brand products to PCO's or to the commercial/industrial insecticide industry. (*Id.* at ¶ 13).

With the exception of sales to bodegas, plaintiff's "MAXFORCE" is not sold to any of the following types of retail outlets: home and garden outlets, convenience stores, drugstores, hardware stores (Moore Dep. at 31–32), discount department stores, supermarkets, warehouse club stores, or variety stores (Freeman Dep. at 265). Plaintiff's only evidence regarding sales of "MAXFORCE" in bodegas is Timothy Moore's testimony that he observed "MAXFORCE" being sold in unidentified bodegas in Queens, New York. (Moore Dep. at 26). Mr. Moore further testified that Cyanamid does nothing to encourage the sale of "MAXFORCE" in retail outlets such as

**1026**

bodegas. (*Id.* at 31). Defendant urges that at best the vague evidence shows that plaintiff's sales of "MAXFORCE" to the consumer market through bodegas are of a "de minimus" nature.[4]

With regard to Cyanamid's sales of "MAXFORCE" through PCO's to householders, Benton Williams co-owner of "B & W," Cyanamid's exclusive sales representative, testified that: "[a] great number of the PCO's sell MAXFORCE bait trays directly to the householder.... from stands in their stores or offices for the reason that if they can't sell the people that come in off the street a pest control service, they can at least try to sell them a pest control product such as MAXFORCE bait trays ... when they make service calls to customer's homes...." (Williams Aff., ¶ 7). John Cloud, Assistant Product Manager of "MAXFORCE" attests that "[a]pproximately 200 PCO's sell MAXFORCE bait trays directly to customers 'over the counter' at their retail stores or offices." (Cloud Aff., ¶ 9).

Defendant points out that neither Kenneth Freeman, Product Manager for insecticides of Shulton USA, Inc., a division of Cyanamid, Timothy Moore, nor John Cloud had any knowledge of the quantity of MAXFORCE being sold to consumers through PCO's. (Freeman Dep. at 63; Moore Dep. at 40; Cloud Dep. at 48). Furthermore, defendant points out that Mr. Cloud testified at his deposition that he could identify only two PCO's who sold MAXFORCE to householders. (Cloud Dep. at 48–50). In its Reply Memorandum, plaintiff has submitted the Affidavit and Supplemental Declaration of Benton Williams, Co–Owner of "B & W," Cyanamid's exclusive sales representative, to which he attaches two lists of PCO's which purportedly re-sell MAXFORCE roach control bait trays directly to consumers at their places of business. (See Exh. A). The lists include over three hundred names.

Defendant's Surreply Memorandum claims that the Williams Affidavits are inaccurate (Surreply at 13–14) and defendant submits the fruits of its own investigation to support this claim: On August 8, 1989, phone calls were placed to fifty companies randomly selected from the 180 companies listed on Exhibit A to the Benton Affidavit. The result of these calls is as follows:

> Of the fifty companies I contacted, 38 or 76% stated that they did not sell MAX-FORCE. Six of the companies did not even know what MAXFORCE is. Eight companies responded that they sell the product although one of them did not have the product in stock (See Exhibit 2) and four companies did not respond due to disconnected telephone numbers or answering machines.

(Wexler Aff., ¶ 3). On August 9, 1989, phone calls were placed to thirty-two randomly selected from the approximately 126 companies listed on Exhibit A of Williams Supplemental Declaration. The result of these calls is as follows:

> Of the thirty-two companies, only one company sold MAXFORCE, and sixteen said they did not. I was unable to obtain seven telephone numbers using directory assistance, apparently because those companies were no longer in business. Eight companies had answering machines or an answering service operating during normal business hours.

(Wexler Aff., ¶ 5)

With regard to sales of "MAXFORCE" through "do-it-yourself" pest control stores, defendant points out that Benton Williams was unable to quantify the sales of MAXFORCE to these stores. (Williams Dep. at 46). Mr. Williams states in his affidavit that while "90–95% of PCO distributors' sales of MAXFORCE bait trays are to pest control operators, [t]he remaining 5–10% ... went to apartment complexes and do-it-yourself pest control stores." (Williams Aff., ¶ 6). It is impossible for

---

**4.** Defendant points out that Robert Hiatt, Senior Executive of Cyanamid, testified at his deposition that it was not his understanding that a material number of consumers could purchase MAXFORCE directly. (Hiatt Dep. at 125, 141). For an emphasis upon the different distribution schemes, see the attached chart presented by plaintiff at oral argument. The arrows used to demonstrate movement of both products to the end users, however, do not persuade this Court that customer confusion is either present or likely.

this Court to determine the actual quantity of MAXFORCE sales made to the "do-it-yourself" stores based on this statement alone.

Plaintiff contends that "[g]iven the substantial goodwill that has been generated in the MAXFORCE name, Cyanamid may easily expand distribution of MAXFORCE directly into traditional consumer markets as the product that professionals have preferred for many years." (Memo in Supp. at 22). The affidavit of Timothy Moore explains, however, that his proposal in 1988 to introduce "MAXFORCE" into the retail market was turned down by Cyanamid management for these reasons:

(1) it would distract our sales force and detract from their efforts with respect to COMBAT insecticides and that (2) the two newly proposed products did not possess a superior new formula or other product dimension to provide the basis of a unique selling proposition for their launch.

(Moore Aff., ¶ 26).

Additionally, Cyanamid was concerned that the entry of "MAXFORCE" into the consumer market "could destroy any potential we had in the markets where it's primarily involved already [i.e. the PCO market]." (Freeman Dep. at 214–15; *see* Moore Dep. at 78–79; Williams Dep. at 99–100). (*See also* Johnson Exh. 66, Cyanamid's "Marketing Plan for MAXFORCE Gel" dated April 7, 1989: "[MAXFORCE] [b]ait trays have not been used extensively in the residential market because of fear that PCO's will train homeowners to use COMBAT.")

In its Reply Memorandum, plaintiff attempts to establish the defendant's presence in the PCO market. First, plaintiff points to an article in the December 1986 edition of "Pest Control" magazine in which it was repeated that S.C. Johnson & Son, Inc. had recently purchased " 'Bugs' Burger Bug Killers," then the third largest pest control company nationwide. (Pl. Exh.

74).[5]  Second, plaintiff points to an article in the July 1989 edition of "Pest Control" magazine, which plaintiff characterizes as "a story … published about Raid Max being made available to consumers." (Reply Memo at 10; *See* Pl. Exh. 75). Plaintiff poses the question: "[W]hy, if MAX is strictly a retail consumer product, as Johnson contends, is it being publicized to the allegedly disparate PCO trade?" (*Id.* at 11). Plaintiff claims that "Johnson wants PCOs to be aware of Raid Max because it is another way of communicating availability of the MAX product to consumers and PCOs, thus enhancing the likelihood of its purchase and use by such individuals." (*Id.*).

Defendant responds by stating that the July 1989 "article to which Cyanamid refers is a news story, not an ad, and neither Johnson nor its outside public relations firm wrote it or solicited its placement with Pest Control Magazine." (Surreply at 8; *See* Georgeson Reply Aff., ¶¶ 2–3). Additionally, defendant correctly notes that the article specifically refers to the defendant's introduction of its new product line into the "home/owner market" and "consumer market." Finally, defendant points to the Reply Affirmation of Cynthia Ann Georgeson in which she states:

Equally inaccurate is Cyanamid's contention that Johnson wants PCO's to be aware of RAID Max so that they will buy the RAID Max products for professional use. We do not market any RAID products to the PCO industry and our understanding is that PCO's don't and would not, use RAID on service calls because if they did, the customers would the next time presumably buy RAID at the supermarket and avoid having to pay for the PCO. Thus, we do not make public relations or marketing efforts geared towards advising the PCO industry about our RAID products.

(Georgeson Reply Aff., ¶ 4).

In a further attempt to establish that "MAXFORCE" and the RAID Max line are

---

**5.** Additionally, Cynthia Ann Georgeson, Johnson's Public Relations Manager of U.S. Consumer Products, acknowledged at her August 2, 1989 deposition that "Bugs Burger" was a Johnson PCO operation, although she did not know whether "Bugs Burger" is presently involved in PCO operations. (Georgeson Dep., at 30–32).

sold in the same market, plaintiff argues that the defendant's targeting sales to poor, inner-city consumers is evidence of defendant's entrance into the public housing market to which plaintiff is, in part, targeting its sales. (Memo in Supp. at 33, citing Exh. 58 at 1934, 1943). The Court notes that no evidence has been introduced to show that, like Cyanamid, Johnson promotes the sale of its insect baits to tenant association groups in inner-city housing developments. (*See* Decl. C. Roy Jackson, ¶¶ 3, 5).

Cyanamid's advertising of "MAX-FORCE" is geared primarily to tenants of public housing authorities (Moore Aff., ¶ 20, Pl. Exhs. 17, 18) and professional pest control operators. (Cloud Aff., ¶ 10). John Cloud and Kenneth Freeman testified that Cyanamid has never advertised "MAX-FORCE" directly to householders. (Cloud Dep. at 790; Freeman Dep. 53).[6] Plaintiff contends that "MAXFORCE publicity is also generated by direct advertising to consumers by PCO's [and that] such advertising is supported by Cyanamid." (Memo in Supp. at 19). Plaintiff states that it "does not maintain regular records of such advertising, although the company knows it occurs." (*Id.*). Plaintiff sets forth only two instances of PCO advertising efforts: (1) In May 1989 Cyanamid received a request from a pest control company seeking ad copy material and advertising suggestions for newspaper advertisement of "MAX-FORCE Pharaoh Ant Killer." (Pl. Exh. 21). Cyanamid responded by supplying ad slicks to the company. (Cloud Dep. at 79–80); (2) On August 13, 1988, a Florida newspaper, the St. Petersburg Times contained an advertisement about "Do–It-Yourself Pest Control" for "MAXFORCE Pharaoh Ant Killer." (*Id.* at 79; Pl. Exh. 22).

Kenneth Freeman testified that the proposed advertising budget for 1989 for "MAXFORCE" was $85,000, but that Cyanamid does not advertise "MAX-FORCE" on television or radio and that its advertisement is limited to professional

journals and publications. (Freeman Dep. at 212–13; Johnson Exh. 1, p. 595). In contrast to plaintiff's advertising audience, defendant's advertisements of its RAID brand products are directed to "householders" by way of television, radio, magazines and display signs. (Pritchard Aff., Exh. 5).

Finally, at oral argument, both counsel focused upon the different immediate markets in which plaintiff and defendant sell their products.

Based on the foregoing, this Court finds that "MAXFORCE" and "RAID Max" products are targeted for sale and are sold in distinct trade channels and that Cyanamid has not established either that Cyanamid has or will enter "MAXFORCE" into the retail market, or that Johnson has or will enter Raid "Max" into the PCO Market.

### 4. Intent of Defendant in Adopting its Mark

■ While wrongful intent of the defendant in adopting the mark is not an absolute pre-condition to a finding of likelihood of confusion, demonstration of such motivation constitutes strong evidence of a likelihood of confusion. *Holiday Inns, Inc. v. Trump,* 617 F.Supp. 1443, 1472, (D.N.J. 1985); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). "[I]f a plaintiff can demonstrate that a defendant adopted a mark with the intent of obtaining unfair commercial advantage from the reputation of the plaintiff, then 'that fact alone may be sufficient to justify the inference that there is confusing similarity.'" *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1368 (D.N.J.1981) (quoting *Amstar Corp.,* 615 F.2d 252). "In attempting to determine intent an important element is the defendant's awareness of the plaintiff's trade name ... prior to its use." *Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 825 (D.N.J.1980) (citing *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 613 (7th Cir.1965)).

---

**6.** Additionally, Robert Hiatt of Cyanamid concedes that Cyanamid has not aggressively pro-

moted the "MAXFORCE" mark in the household market. (Hiatt Dep. at 140).

Defendant introduced its line of "Raid Max" products to the market in April 1989.[7] Plaintiff attempts to show through documentation that "at or about the time it decided to launch ... Max, Johnson was thoroughly preoccupied by the erosion of its market share to Cyanamid" and, accordingly, had a motive for attempting to gain unfair commercial advantage. (Memo in Supp. at 24). First, plaintiff points to a letter dated June 17, 1988 from one of Johnson's advertising agencies to Ravi Saligram, a Senior Product Manager for RAID brand, which enclosed a magazine article about the effectiveness of Cyanamid's new "Pharaoh Ant Bait." The letter stated in part:

The growth of the ant bait segment and this new improvement to their already very effective product might encourage Combat to more aggressively pursue this segment. We should at least consider that scenario in our 1989 planning.

(Pl. Exh. 33 at 1554).

Another document is a Johnson internal memorandum dated June 21, 1988 regarding "MAXFORCE PHARAOH ANT BAIT" which states in part: "We have to assume American Cyanamid will pursue this for the consumer products market. What can we do about it?" (Pl. Exh. 34 at 4693). Additionally, an internal memorandum dated July 14, 1988 from Beth Pritchard, Product Manager for Raid Max, provides in part that: "[i]t appears that American Cyanamid's Max Force Pharaoh Ant Killer is having a tremendous reception in the PCO business." (Pl. Exh. 35). Accordingly, Ms. Pritchard requested that the active ingredient lists of the product be reviewed to determine the key "attractant." (Pl. Exh. 35). Next, plaintiff sets forth a Johnson internal memorandum dated July 29, 1988

regarding "MAXFORCE PHARAOH ANT BAIT" in which the writer responds to the question "will it become a consumer product?":

Our answer is ... that it is very likely the product will be introduced to the consumer market. The reasons are:

American Cyanamid applied for and received EPA registrations on formulas containing Amdro, for a product called Max Force Pharaoh Ant Killer for *commercial* and *consumer* applications.

(Pl. Exh. 36).

With regard to Plaintiff's Exhibit 35, defendant points out that Ms. Pritchard expressed her recognition that "MAXFORCE" is a PCO product. Additionally, defendant notes that Plaintiff's Exhibit 33 expresses the concern that Cyanamid's "Combat" and not "MAXFORCE" would enter the retail market with the new attractant. (Memo in Opp. at 33 n. 32).[8] (*See* Pritchard Aff., ¶¶ 38, 39). Defendant urges that:

It is simply fatuous for Cyanamid to contend that Johnson, in preparing to market a new line of RAID products, with introductory advertising expenditures alone amounting to $10,000,000 (Pritchard Aff., ¶ 53), would have been in the least motivated to appropriate the "fame" of a mark as little known as MAXFORCE or, if that were Johnson's intention, that it rationally could believe that it would succeed in that purpose simply by using the commonplace word "Max".

(Memo in Opp. at 72).

Plaintiff also submits the written comments of Ravi Saligram made during an August 3, 1988 meeting in which Johnson

---

**7.** Defendant clarifies in its Surreply Memorandum that April 25, 1989 was the date that Johnson announced the "Raid Max" line to the media, but that it began shipments of "Raid Max" to the retail trade in late March. (Surreply at 6 n. 7, citing Pritchard Aff. ¶¶ 51, 53)

**8.** Kenneth Freeman of Cyanamid testified that Cyanamid's "Combat" roach and bait products are *identical to its* "MAXFORCE products. (Freeman Dep. at 26–28). "Combat", unlike "MAXFORCE" is sold to retail outlets such as

supermarkets, drug stores, discount department stores, warehouse club stores, hardware stores, and variety stores (*Id.* at 264–65). Cyanamid acknowledges in its Reply Memo that it "does not dispute that MAX competes more directly with COMBAT than it does with MAXFORCE." (Reply at 34). Indeed, it was *that* competition that was plaintiff's "primary motivation," though "not the sole motivation," in bringing the present action to prevent defendant from using the term "MAX." (Freeman Dep. at 362.)

employees discussed the "New Raid Plus Line" which ultimately became Raid Max. (Pl. Exh. 38, 41; Pritchard Tr. II at 85). Mr. Saligram noted in pertinent part: "Go after MAXFORCE with Off."

Defendant correctly points out that plaintiff omitted the words "with Off" when citing Mr. Saligram's notation to the Court. (*See* Memo in Supp. at 28). Defendant submits the affirmation of Mr. Saligram to explain the meaning behind the notation:

> As to the notation "Go after Maxforce with Off", I believe that, after the reference to MAXFORCE, Mr. Farley made a statement which engendered that note. In fact, I believe his full statement was "Go after Maxforce with Maximum Strength Off." (The OFF! product is an insect repellant with 100% of active ingredients [marketed by Johnson] and its use of the "Maximum Strength" did not offend the EPA's policy against use of that term for insecticides.) The comment had nothing to do with use of the word "Max" for the new RAID line for the simple reason that we had not then decided on the nomenclature of those products. Neither did the comment pertain to "going after Maxforce" in the marketplace with the new line because MAXFORCE never was considered to be of competitive consequence to RAID. Rather, it can only be characterized as an idle comment by Mr. Farley because MAXFORCE includes MAX which, in context, conveyed the same message as Maximum Strength as used for many years on the Maximum Strength OFF! product. Mr. Farley's comment elicited no discussion and the subject was not pursued. In fact, OFF! is a line of insect repellents and in no manner offered a way to "go after" the wholly non-competitive MAXFORCE insecticides.

(Saligram Aff., ¶ 5).[9]

In its effort to establish defendant's bad faith for its use of the name "Max," plaintiff also refers the Court to a letter dated February 23, 1989 which was written to a Johnson employee by Erik Olson, Vice President of a public relations firm working for defendant, which states:

> Just a quick thought on the publicity implications of recent Maxforce Pharao [sic] Ant News coverage.
>
> In addition to the positive publicity implications you mentioned, the Maxforce name probably will be confused with Max Ant Bait. Consumers may believe that the effective solution they got from their PCO in January, will now be available in the grocery store in May. If the product is as good as you say, we may not want to discourage that kind of thinking by differentiating our Max Ant Bait.

(Pl. Exh. 24).

In response to plaintiff's reliance on Mr. Olson's letter to show defendant's intent to confuse the consumer, defendant emphasizes that this letter was written months after the decision to utilize the name "Raid Max" had been made. (Memo in Opp. at 72; *see* Pl. Exh. 43). Defendant further urges that at the time Mr. Olson wrote the letter, he did not consider that the actual "Raid Max" products contained the name RAID on them. (Olson Dep. at 103). Mr. Olson testified:

> If RAID had been on my mind, I'm sure I wouldn't have written this the way it sounds.... RAID is recognized probably by 99 percent of the American households. I don't have any idea what the exact number is. RAID Max is very distinctive.

*Id.* Additionally, Mr. Olson testified that since he sent the February 23, 1989 letter he has never communicated with anyone at Johnson about MAXFORCE and furthermore that no one at Johnson had ever indicated to him a desire to confuse in the consumer's mind MAXFORCE and Raid Max. (Olson Dep. at 105, 110). While certainly probative, Olson's letter is not determinative on the issue of any intent by Johnson to induce consumer confusion.

---

9. Even if Johnson was motivated to "go after MAXFORCE," if it did so by permissible means no claim will lie against it. Aggressive, focused marketing of competing products is the essence of American free enterprise. Such conduct will not be actionable if it is conducted within the boundaries of governing rules of law.

Plaintiff considers it to be highly probative of an intent to confuse consumers that defendant decided to use the name "MAX" after considering a list of hundreds of potential names which did not include "MAX." (Memo in Supp. at 58, Pl. Exh. 39). Plaintiff points out that the results of Johnson's name research listed "Maximum Strength" as the preferred name, "Max Strength" as the fourth choice, and "Maxx" as the seventh choice. (Pl. Exh. 42). Ms. Pritchard's credible explanation of the reason defendant chose not to use any of these names demonstrates that there was no bad faith in selecting the name "Max":

> In the initial consumer research, the description with the highest score was 'RAID Maximum Strength.' However, 'RAID Maximum Strength' presented two significant problems. First, we considered it to be far too long, in that its 15 letters (and four syllables) would take up excessive space on the packaging and in advertising.... [I]n mid-August we had drawings made up of sample packaging for the new RAID line using various descriptors then under consideration (Exhibit F).... the Raid 'Maximum Strength' package (*id.*, p. 963) is quite cluttered and not nearly as bold and dramatic as the packages containing shorter names.... The alternative 'Raid Max Strength' had much the same drawback. Second, we were advised by our legal regulatory group that, based on past experience, we were likely to have difficulty getting the EPA to approve any household insecticide product described as 'Maximum Strength.' ... it was vitally important to begin shipping the new RAID line by March so that it would be available in retail stores for the 1989 season, and any delays at the EPA over the words 'Maximum Strength' would have made achieving that target impossible. On the other hand, the EPA had approved many uses of 'Max' for insecticides and herbicides.

\* \* \* \* \* \*

[N]ew research [see Exh. G] convincingly demonstrated that the single 'x' version 'Max' was a much clearer and better understood communicator than 'Maxx' of the fact that these were highly effective products—especially to heavy users of insecticides, the specific group to which the new RAID line was to be targeted. (Pritchard Aff., ¶¶ 26, 29).

Defendant's decision to name its new line of insecticides "Raid Max" was finalized on September 7, 1988. (Pl. Exh. 43). Plaintiff points out that prior to Johnson's decision to use the term "Max", Johnson's in-house trademark counsel Patrick Boland obtained a Trademark Research Report which revealed Cyanamid's registration of the trademark "MAXFORCE". The Court notes that the Trademark Research Report also revealed numerous other products which use either "Maxx" or "Max" as the complete trademark or as part of a longer name. (Pl. Exh. 55). After reviewing the report, Mr. Boland obtained additional information on four trademarks: (1) "MAX-FORCE"; (2) "MAXX Kill"; (3) "MAXX Spot Kill"; and (4) "MAXX 90". (Boland Dep. at 48). Defendants have stipulated that Beth Pritchard of Johnson was aware of Cyanamid's "MAXFORCE" trademark prior to her decision to use the name "Max." (Pritchard Tr. I at 133). Defendant urges that this awareness does not evince "the intention of benefitting from any goodwill allegedly associated with MAXFORCE". (Memo in Opp. at 33). Rather, Ms. Pritchard stated in her affirmation that the reasons for her selection of "Max" were in part as follows:

> My decision took into account the consumer research ... which revealed that the concept of advanced technology to fight serious infestations, which was to be the cornerstone of our new RAID line, was best communicated by phrases suggesting maximum strength and efficacy. Having eliminated 'Maximum Strength' and 'Max Strength' for the reasons noted above, I concluded that RAID 'Max' was the perfect choice. It was short, consisting of but three letters and a single syllable, and it clearly conveyed the meaning of maximum strength because 'Max' is a universally understood abbreviation of the word 'maximum,' and

would unmistakably inform consumers that the RAID Max insecticides were maximum strength products. The fact that 'Max' could, with merely three letters, powerfully communicate the entire concept of maximum strength and efficacy to fight serious roach problems was of critical importance for a packaged product which is displayed on retail store shelves and which would be intensively advertised to the general public.

\* \* \* \* \* \*

I did not conceive at the time that the word 'max', to describe a product, was proprietary to any insecticide product, whether it be a product of Johnson or a competitor.

(Pritchard Aff., ¶¶ 27, 45)

Additionally, Ms. Pritchard's deposition testimony demonstrates the absence of bad faith in adopting the name "Max":

Q. And if MAXFORCE was put on a product that competed with the Johnson insecticides and if MAXFORCE was in earlier use, didn't you realize that you might be precluded from using Max?

A. First of all, MAXFORCE does not compete with our consumer insecticides. Secondly, even within their market which is the PCO market I believe there are a number of other Max-type names, so certainly they didn't preclude anybody from using it nor was their usage precluded by other people's usage of it. Separate markets already had MAX names there as well as in terms of the consumer insecticide and repellent market. Maximum, MAX, is used across the board as descriptors.

(Pritchard Tr. II at 40).

Finally, defendant has pointed to recent consumer awareness studies which conclude that 99% of American consumers recognize the RAID brand. (*See* Pritchard Aff., ¶ 5; Johnson Exh. 67 at 1939 and Exh. 68 at 1936). As this Court noted above, the "Raid" brand identifier is highly visible on defendant's "Raid Max" products. Plaintiff has not shown that its "MAXFORCE" trademark has strong recognition in the retail market. It seems, therefore, highly unlikely that defendant would have intended to usurp a portion of plaintiff's trademark in order to gain a competitive advantage.

### 5. Evidence of Actual Confusion

Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless highly probative of the likelihood of confusion. *See Television Enterprise Network, Inc. v. Entertainment Network, Inc.*, 630 F.Supp. 244, 248 (D.N.J.1986); *Holiday Inns, Inc. v. Trump*, 617 F.Supp. 1443, 1473 (D.N.J. 1985). Plaintiff urges that in the short amount of time since Johnson's "Raid Max" line was introduced on the market (April 1989) there is already "significant evidence of actual confusion." (Memo in Supp. at 5; *see Id.* at 39, 56). First, plaintiff points to the following deposition testimony of Timothy Moore in which he recounts the instance of actual confusion on the part of an adult babysitter who works for Mr. Moore's family:

Q. Have you heard—are you familiar with any instances in which somebody has been confused with RAID Max and MAXFORCE?

A. Yes ... My baby sitter was at our place for dinner the other night and she understands that I work for Cyanamid, and one of the things that I do is write notes to her on the refrigerator, and I use MAXFORCE letterhead, and we were sitting at dinner the other night and she said to me, "I saw your new ad." And I said, "Tell me about it." And she proceeded to describe the Max aerosol ad, and I said, "How did you know that's my product?" She said, "Well, because of your letterhead over there," which was there on the door which was MAXFORCE letterhead. I didn't correct her but she was convinced that Max aerosol was MAXFORCE.

(Moore Dep. at 68).

Next, plaintiff relies on the Declaration of Dr. Austin Frishman, a pest control consultant, who initiated a pest control program at the Hartford Housing Authority in Connecticut where Cyanamid's "MAXFORCE" roach baits are used. (Frishman

Decl., ¶ 4). On May 5, 1989 Dr. Frishman observed that some tenants had replaced their "MAXFORCE" roach bait trays with those of the defendant. (*Id.* at ¶ 7). Dr. Frishman states that on this day:

> I asked the first tenant in whose apartment I observed this slightly different roach bait tray what it was. The tenant responded that she had purchased the product in a store and that it was the MAXFORCE bait tray that had been placed in her apartment previously by the Hartford Housing Authority's pest control operator. When I picked up the bait and looked on the back I saw that the product was not MAXFORCE but was S.C. Johnson's "MAX ROACH BAIT".
>
> \*     \*     \*     \*     \*     \*
>
> I questioned the tenants in the remaining apartments I inspected who had replaced MAXFORCE baits with the S.C. Johnson MAX baits. I again asked each of them what the product was and the answer was the same in every case. The tenant had purchased the S.C. Johnson MAX roach bait and had placed it near the old MAXFORCE bait and believed that the products were the same.

(*Id.* at ¶¶ 7, 8).[10]

Dr. Frishman also states that he has observed confusion on the part of PCO's for whom he acts as consultant. His declaration provides in pertinent part:

> One of my activities as a consultant is to visit my PCO clients to inform them of new insecticides or pest control products and keep them abreast of each new development in the business of which I have become aware. Following my May 5 visit to Hartford Public Housing Authority, I had such visits with about 15 companies engaged in pest control operations and either mentioned or showed to them the S.C. Johnson MAX roach bait product. These companies were not aware of the product prior to my inform-

ing them of it. Each of them reacted in the same way. They believed that the S.C. Johnson MAX product was American Cyanamid's MAXFORCE roach bait.

> One of the most recent examples of this confusion that I have encountered among the pest control operators occurred on June 29, 1989. At that time I visited another of my clients, Exco Exterminating Company, located in Manhattan, New York. This company has extensive pest control operations and employs a staff of 49 service technicians for this purpose. In a meeting during which I addressed all 49 of these technicians together, I displayed the new S.C. Johnson Raid MAX roach bait product. Several members in the audience of these technicians immediately responded that it was Cyanamid's MAXFORCE product.

(Frishman Decl., ¶¶ 9, 10).

Defendant points out that any confusion on the part of PCO technicians is irrelevant since according to a Project Report of "MAXFORCE" prepared for Cyanamid, the PCO technicians perform the actual pest control treatment and "seem to be aware only of [what products are] available in their own warehouse (which has been selected by the owner/manager)." (Johnson Exh. 62 at 1821, 1823).

Next, plaintiff relies in part on the following portion of Benton Williams' affidavit to show confusion on the part of PCO's:

> The first time that I learned of Johnson's Raid MAX product was when I received a telephone call from a PCO who wanted to know what Cyanamid was doing because Cyanamid had represented to the PCO's that MAXFORCE would never be put in the retail line and the PCO demanded to know why we had done this.

> The first call was from a PCO in Florida. There were 25 to 30 additional calls from other PCO's in the same vein over the next two weeks.

---

10. Defendants point out that Dr. Frishman does not identify the number of tenants who had replaced the "MAXFORCE" roach bait tray with that of the defendant. Defendant also points out that Dr. Frishman's contemporaneous notes of his May 5, 1989 inspection did not mention his observations regarding "MAXFORCE" and "Raid Max." (Memo in. Opp. at 45-46; *see* Wexler Aff., Exh. 9).

I emphatically assured each of these callers that the product they had seen was not Cyanamid's MAXFORCE insecticide, but was a product by Raid named MAX and it had nothing to do with MAX-FORCE.

(Williams Aff., ¶¶ 8–10).

Defendant urges that confusion on the part of the PCO's who actually purchase the insecticide products is unlikely considering the broad range of information available to them and the resulting high level of new product awareness. (*See* Johnson Exhs. at 934–35; *Id.* Exh. 42 at 865–67). Defendant also points to the following portion of deposition testimony by Timothy Moore, Product Manager of "MAX-FORCE":

> Q. In your experience, are pest control operators who are aware of MAX-FORCE generally aware that it's a product of American Cyanamid?
>
> A. Yes.
>
> Q. And those pest control operators would also be familiar with RAID, would they not?
>
> A. I'd have to believe they are, yes.

(Moore Dep. at 66). Additionally, Mr. Moore conceded that PCO's as a group would be less likely than the general population to be confused by Raid Max versus MAXFORCE "because [PCO's] do read labels." (Moore Dep. at 337; *See* Freeman Dep. at 435–36).

Plaintiff's evidence of actual confusion by tenants in the Hartford Housing Authority is not strong considering the lack of evidence regarding the quantity of replacement bait trays purchased by these tenants and the lack of evidence that "MAX-FORCE" is available in any retail stores in the Hartford area. This is significant because as defendant points out: "even if [the tenants] wanted to buy MAXFORCE they cannot do so, and any purchase of RAID Max they might make is not, there-fore, at the expense of MAXFORCE sales." (Memo in Opp. at 47)[11] Furthermore, evidence of actual confusion on the part of PCO's is not significant in light of testimony by key Cyanamid employees that generally PCO's do not buy insecticides in the retail market. (Lowry Dep. at 149; *see* Moore Dep. at 348–49).

*Conclusion*

The Court has carefully examined the submissions of both parties in an effort to determine whether defendants' use of the term "Max" on its new product line is likely to create consumer confusion. It has been guided upon this journey not only by the authorities, principles and facts discussed above but also by the well-reasoned decision of the United States District Court for the Southern District of Florida in *Bell Laboratories, Inc. v. Colonial Products, Inc.*, 644 F.Supp. 542 (S.D.Fla.1986). There, the Court, addressing many issues and considerations directly pertinent here, held that plaintiff was not entitled to a preliminary injunction because it failed to establish a likelihood of ultimate success in proving that defendant's "FINAL FLIP" infringed upon plaintiff's registered, incontestable trademark "FINAL" regarding similar rodenticides. As with the plaintiff in *Bell Laboratories*, plaintiff has failed to establish a likelihood of consumer confusion between the products and marks in question. Accordingly, plaintiff has failed to demonstrate either a compelling need for preliminary injunctive relief or a reasonable likelihood that it will ultimately prevail on the merits of this litigation.[12] Plaintiff's application for a preliminary injunction is denied.

---

11. Defendant also observes that in as much as "the housing authority tenants are provided with the MAXFORCE products free of charge, [i]t is highly doubtful that more than a de minimis number would spend their own money to buy a similar roach bait product unless the housing authority failed to provide sufficient units of MAXFORCE for their use." (Memo in Opp. at 47).

12. Because of this failure, the Court need not address specifically the issue of whether plaintiff has demonstrated irreparable injury *pendente lite.*