TAJ MAHAL ENTERPRISES,
LTD., Plaintiff,

v.

Donald J. TRUMP, Trump Taj Mahal
Associates Limited Partnership,
and Trump Taj Mahal, Inc., Defendants.

Civ. A. No. 90–1503 (JFG).

United States District Court,
D. New Jersey.

Aug. 15, 1990.

John J. Barry, Clapp & Eisenberg, Newark, N.J., John M. Donnelly, Clapp & Eisenberg, Atlantic City, N.J., W. Mack Webner, Baker & Hostetler, Washington, D.C., for defendants Donald J. Trump, Trump Taj Mahal Associates Limited Partnership, and Trump Taj Mahal, Inc.

Robert M. Skolnik, West Long Branch, N.J., John K. Donaghy, Brandywine, Md., Robert G. McMorrow, Sughrue, Mion, Zinn, MacPeak & Seas, Washington, D.C., for plaintiff Taj Mahal Enterprises, Ltd.

## OPINION

GERRY, Chief Judge.

Plaintiff, Taj Mahal Enterprises, Ltd., brought this action against defendants, Donald J. Trump, Trump Taj Mahal Associates Limited Partnership and Trump Taj Mahal, Inc., for service mark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051 et seq., as well as common law unfair competition. Plaintiff owns a restaurant under the registered mark TAJ MAHAL, and it alleges that defendants have infringed this mark by naming their new casino and hotel in Atlantic City, New Jersey, the TRUMP TAJ MAHAL. On June 4, 1990, the court denied plaintiff's motion for a preliminary injunction that would have stopped defendants' continued use of the name TAJ MAHAL. At this time, defendants have moved for summary judgment and for dismissal of plaintiff's punitive damages claim. Defendants also have moved for an award of attorneys' fees under 15 U.S.C. § 1117.

### I. The Undisputed Facts

Plaintiff opened an Indian restaurant in 1965 and named it the TAJ MAHAL. The restaurant has been located at 1327 Connecticut Avenue, N.W., in Washington, D.C., for the past 25 years. It was initially owned and operated by plaintiff, but now plaintiff leases the restaurant to C & M, Inc., which currently operates it. C & M, Inc. has operated the restaurant since May 1, 1984, and C & M, Inc. is now solely responsible for the advertising and promotion of the TAJ MAHAL restaurant, as well as for hiring and managing the employees and purchasing, preparing and serving the food. C & M Inc. pays $4,500 rent plus property taxes to plaintiff each month.

Plaintiff is a corporation owned entirely by Raj Mallick and incorporated under the laws of the District of Columbia. Mr. Mallick owns other establishments, including hotels and other restaurants, in the District of Columbia, California, Pennsylvania and Virginia. There is no evidence that any of Mr. Mallick's other properties is or has been named the TAJ MAHAL. In fact, plaintiff has never done business outside of the District of Columbia. Plaintiff's sole current business is the collection of rent for the TAJ MAHAL restaurant. On June 23, 1981, the United States Patent and Trademark Office granted plaintiff registered service mark number 1,158,610 for the provision of restaurant services under the name TAJ MAHAL.

The TAJ MAHAL restaurant serves exclusively Indian cuisine, and it is located on the second floor of a two story building in a commercial section of Washington. In

order to get to the restaurant, a patron must climb a flight of stairs with 25 steps. The restaurant seats approximately 74 people at a given time, and it employs six people. Its gross sales are approximately $300,000 per year or $830 per day. The most expensive single dish on plaintiff's menu is shrimp biryani, which is rice cooked with shrimp and flavored with nuts and spices, at a cost of $12.25. The complete "Taj Dinner" costs $18.00 and includes soup, meat curry, vegetable, rice, raita, puri, dessert, and tea or coffee.

Plaintiff has submitted a list of 25 patrons who have dined at the restaurant over the past 25 years to show the national and international scope of its clientele. During that time, diners at the TAJ MAHAL have come from such faraway places as India, Pakistan, Canada, France, and Great Britain, in addition to such places as Stamford, Connecticut, Glenolden, Pennsylvania and Bismarck, North Dakota. The TAJ MAHAL restaurant advertises by using its name on its napkins and menus, hand-billing at subway stations in Washington, and purchasing space in the Yellow Pages. The restaurant is also advertised in magazines, local Indian–American and Pakistani–American newspapers, and local hotel patron guides. C & M, Inc., not plaintiff, pays for the advertising.

At least 24 other restaurants in the United States currently are named TAJ MAHAL, including two in New Jersey and two in the metropolitan New York area. Two such TAJ MAHAL restaurants, located in Colonia, New Jersey and Seattle, Washington, have used that name for 14 years. Prior to February 1990, plaintiff never tried to stop any other restaurant from using the name TAJ MAHAL. At least 70 businesses in the United States have used the name TAJ MAHAL, and plaintiff has never brought suit to stop any of them from using its name. In February 1990, plaintiff had a company name search conducted in order to uncover other uses of the name TAJ MAHAL. As a result of the search, plaintiff sent five cease and desist letters to third parties who use the mark without plaintiff's authorization. Plaintiff sent these letters to restauranteurs in San Francisco, Sacramento and Fresno, California, as well as Dallas, Texas and West Hempstead, New York.

Mr. Mallick, plaintiff's owner, admits that he learned about the defendants' new establishment, the TRUMP TAJ MAHAL CASINO–RESORT, in September 1989. Mr. Mallick visited Atlantic City in August–October 1989 and saw the building which is now the TRUMP TAJ MAHAL. He denies seeing the name on the building. In early February 1990, defendants attempted to buy the registered TAJ MAHAL service mark from plaintiff. On February 22, 1990, plaintiff's attorney wrote defendants and requested that they cease using the name TAJ MAHAL for their hotel and casino project. Except for defendants, plaintiff apparently did not send cease and desist letters to any other New Jersey establishment which uses the name TAJ MAHAL.

The facility which now bears the name TRUMP TAJ MAHAL was first named the TAJ MAHAL in the Spring of 1986, before it was purchased by defendants. The previous owners, Merv Griffin and Resorts International, spent over $2 million to promote this project, and they sold the facility to defendants sometime in 1987. Signs bearing the name TAJ MAHAL were placed on the facility during its construction, at least as early as 1988. The TRUMP TAJ MAHAL cost hundreds of millions of dollars to build, and its estimated operating costs are $1.2 million per day. Defendants opened the hotel and casino on April 2, 1990. They estimate that the property's daily gross income will at least equal the daily operational costs.

The TRUMP TAJ MAHAL is the tallest building in New Jersey at 51 stories, and it contains 4.2 million square feet of space, 1250 guest rooms, a 120,000 square foot casino, and 175,000 square feet of meeting and conference rooms. The most expensive suite, the Alexander the Great Suite, costs $10,000 per night. The TRUMP TAJ MAHAL employs over 7,000 people and contains ten restaurants and four cocktail lounges. None of the restaurants are named TAJ MAHAL or feature Indian cui-

sine. The variety of restaurants include a steak house, a delicatessen and a seafood restaurant, in addition to others which serve ethnic foods such as Italian and Oriental cuisine.

Defendants spent $3.2 million advertising the project between November 1988 and April 2, 1990. The signs which currently display the name TRUMP TAJ MAHAL were placed on the building in October 1988, and they cost several thousand dollars per letter. Moreover, the name TAJ MAHAL, along with the name TRUMP, appears on the four faces of the building, and the name TRUMP TAJ MAHAL appears literally thousands of times throughout the hotel and casino. For instance, this name is found on each of the 3,008 slot machines in the casino. In many of defendants' signs, the term TAJ MAHAL appears in different lettering and proportion than does the name TRUMP. The cost of the signs bearing the names TAJ MAHAL or TRUMP TAJ MAHAL was $11 million.

Prior to June 20, 1990, no one had expressed any confusion to plaintiff concerning its possible relationship to defendants' casino. Since that time, eight individuals have indicated some confusion to plaintiff's owner, Mr. Mallick. Only four of these people have submitted affidavits, and the other four instances of confusion appear in copies of letters or handwritten notes to Mr. Mallick. These eight people appear to be an assortment of Mr. Mallick's personal friends, business associates and patrons. None of these people actually went to the TRUMP TAJ MAHAL and patronized it under the mistaken impression that it was related to plaintiff's restaurant. Their confusion was manifested in one of two ways. Some of them simply expressed concern to Mr. Mallick about any links he may have to defendant Donald Trump and his allegedly beleaguered financial empire. Others asked Mr. Mallick to help them get reservations or discounts at the TRUMP TAJ MAHAL under the belief that he was associated with the casino in some way. Defendants have never heard anyone express confusion about their relationship, or lack of relationship, to plaintiff.

## II. *The Standard for Summary Judgment*

■ Although the underlying facts are undisputed, the parties strongly disagree about the propriety of granting summary judgment in this case. The parties' dispute emerges from the ambiguity about whether the element of consumer confusion is an issue of law or an issue of fact. *See American Home Products v. Barr Laboratories*, 834 F.2d 368, 370–71 & n. 2 (3d Cir. 1987) (review on appeal as issue of fact); *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1086 (6th Cir.1983) (issue of law). In response to this dispute, we simply note that the same standard for summary judgment applies in a trademark infringement action as in any other type of action. *See Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 876 (2d Cir.1986).

■ On a motion for summary judgment, the moving party has the burden to demonstrate under the undisputed facts that the non-moving party has failed to set forth evidence supporting a necessary element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the moving party makes such a showing, the non-moving party then has the burden to indicate which portions of the record support the allegedly unsupported element. *Id.* at 322–23, 106 S.Ct. at 2552–53.

■ Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). An issue is "genuine" only if a reasonable jury, considering the record evidence, could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In explaining the standard, the Supreme Court has stated:

> [T]his standard mirrors the standard for a directed verdict ... which is that the

trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.... If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.... In essence, ... the inquiry under each standard is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Anderson,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12 (citations omitted). The non-moving party must establish more than a mere scintilla of evidence in its favor in order to survive a motion for summary judgment. *Id.* at 249, 252, 106 S.Ct. at 2510, 2512; *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989). While the court should not "weigh the evidence," it nonetheless must determine how one-sided the evidence is and how a "fair minded jury" could reasonably decide the case.[1] *Williams,* 891 F.2d at 460; *see Anderson,* 477 U.S. at 249, 252, 255, 106 S.Ct. at 2510, 2512, 2513. If the evidence is so one-sided that a reasonable jury could not find for the non-moving party, no genuine issue of material fact exists, and the motion for summary judgment should be granted. *Anderson,* 477 U.S. at 249–52, 106 S.Ct. at 2510–12. The standard for summary judgment must be applied on a fact specific basis, case by case. *Williams,* 891 F.2d at 460–61.

In stating the standard, it may be remembered that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules [of Civil Procedure] as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. at 2555.

### III. *The Claims for Service Mark Infringement and Unfair Competition*

#### A. *Likelihood of Confusion*

■ Plaintiff originally brought this action for service mark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a). In its amended complaint, plaintiff has added a claim for unfair competition based on state and common law. Plaintiff filed the amended complaint on April 23, 1990. Under the common law claim, plaintiff incorporates theories of trade dress infringement and passing off. Defendants now urge the court to strike the amended complaint and plaintiff's common law claim as untimely under Fed.R.Civ.P. 15(a). Defendants argue that plaintiff could only have amended its complaint with leave of the court following defendants' filing of their motion to strike and dismiss the complaint on April 10, 1990. We reject defendants' argument due to the language of Fed.R. Civ.P. 15(a) and the established interpretation of that language.

■ Fed.R.Civ.P. 15(a) permits a party to amend its pleading "once as a matter of course at any time before a responsive pleading is served...." After a responsive pleading has been served, a party may only amend its pleading upon leave of the court or the opposition's consent. Fed.R. Civ.P. 15(a). A motion is not a responsive pleading, and a party may amend its complaint without leave of the court after the filing of a motion to dismiss or a motion to strike. *Jafree v. Barber,* 689 F.2d 640, 642 (7th Cir.1982); *Neifeld v. Steinberg,* 438 F.2d 423, 425 n. 3 (3d Cir.1971); *Hantover, Inc. v. Omet, S.N.C. of Volentieri & Co.,* 688 F.Supp. 1377, 1380 (W.D.Mo.1988); Wright, Miller & Kane, Federal Practice and Procedure § 1483 (1990). Accordingly, we will treat with plaintiff's complaint as amended for purposes of defendants' summary judgment motion.

Under the Lanham Act, section 1114(1) prohibits the use of a registrant's mark when such use is likely to cause confusion, to cause mistake or to deceive the consuming public. 15 U.S.C. § 1114(1)(a). Section 1125(a) prohibits the knowing use of any false designation of origin. 15 U.S.C.

---

**1.** In *Anderson v. Liberty Lobby, Inc.,* the seemingly paradoxical nature of these instructions is the subject of Justice Brennan's dissenting opinion. 477 U.S. at 265–68, 106 S.Ct. at 2518–20.

§ 1125(a). The test for infringement under either section 1114(1) or section 1125(a) is whether defendant's use of the mark is likely to cause confusion with plaintiff's mark.[2] *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap and Emblem Mfg., Inc.*, 510 F.2d 1004, 1013 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975).

Although plaintiff's mark is registered and entitled to a high level of protection, plaintiff must still prove a likelihood of confusion in order to succeed on its infringement claims. *Lois Sportswear*, 799 F.2d at 871; *see Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1395, 1403–04 (3d Cir.), *cert. denied*, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985) (describing rights of registrant). A likelihood of confusion is also an essential element of plaintiff's state and common law claims.[3] *Apollo Distributing Co. v. Jerry Kurtz Carpet Co.*, 696 F.Supp. 140, 143 (D.N.J.1988) (common law unfair competition and New Jersey law of unprivileged imitation); *Holiday Inns, Inc. v. Trump*, 617 F.Supp. 1443, 1464 (D.N.J. 1985) (common law service mark infringement); *Columbia Broadcasting System, Inc. v. Melody Recordings*, 134 N.J.Super.

**2.** There is some question in the Third Circuit about the proper test for trademark infringement in different contexts. In some contexts, the Third Circuit indicates that the court must look to whether plaintiff's mark has developed a secondary meaning. *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983). The secondary meaning inquiry is generally applied where the owner of the mark and the alleged infringer deal in competing goods or services, and the issue becomes whether the owner's mark is inherently distinctive or has acquired sufficient secondary meaning to make it distinctive as compared to the alleged infringer's mark. *Id.* When the owner of the mark and the alleged infringer deal in non-competing lines of goods or services, the Third Circuit indicates that the court must look for the likelihood of confusion as to the origin of the parties' respective goods or services. *Id.* The Third Circuit has stated:

"Likelihood of confusion and secondary meaning are in theory distinct concepts. In practice, however, the evidence required to show either, and the legal consequences flowing from a finding of either, will be virtually indistinguishable.... Secondary meaning exists when consumers seeing a trademark assume that the product it labels came from a particular source. If in fact the product did not come from that source, then there has been buyer confusion. The test [for secondary meaning] is thus indistinguishable in practice from the more traditionally phrased likelihood of confusion test."

*Id.* In fact, the Third Circuit has adopted its test for likelihood of confusion from a case dealing with secondary meaning. *Id.* (applying ten factor test from *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (3d Cir.1978)). While plaintiff and defendants in the present case deal in food and restaurant services, defendants also deal in other services which plaintiff does not, like casino gambling and guest accommodations. Therefore, we will refer to the applicable standard for infringement as likelihood of confusion throughout this opinion, while we are cognizant that our inquiry may properly encompass the concept of secondary meaning in some respects.

**3.** It should be noted that "common law rights are restricted to the locality where the mark is used and to the area of probable expansion." *Spartan Food Systems, Inc. v. HFS Corp.*, 813 F.2d 1279, 1282 (4th Cir.1987). Therefore, a senior user of a mark may not be able to enforce its common law rights against a junior user when the parties do not compete within the same geographic market. *Natural Footwear*, 760 F.2d at 1394; *see GTE Corp. v. Williams*, 649 F.Supp. 164, 171 (D.Utah 1986), *aff'd*, 904 F.2d 536, 14 U.S.P.Q.2d 1971 (10th Cir.1990). In this regard, the Third Circuit has stated:

"[T]he senior user of a common law mark may not be able to obtain relief against the junior user in an area where it has no established trade, and hence no reputation and no good will. We have ... taken this approach in a case involving a nationally registered trademark. In *Holiday Inns of America, Inc. v. B & B Corp.*, 409 F.2d 614, 617 (3d Cir. 1969), we concluded that use and registration of a mark do not guarantee that injunctive relief will be available to protect the senior user in all areas of the country, as the marks must be at large in the same market place and compete for the same customers.' "

*Natural Footwear*, 760 F.2d at 1394. In the present case, plaintiff does not operate in New Jersey, nor is there any evidence that plaintiff plans to expand its activities to New Jersey. The record evidence does support the inference that defendants target consumers throughout the Middle Atlantic States and the Washington, D.C. area. Accordingly, the geographic overlap of the parties' activities would be relevant in determining the appropriate scope for any injunctive relief which could be considered in this matter.

368, 377, 341 A.2d 348 (App.Div.1975) (unfair competition as "palming off"); *Cascade Pools Corp. v. Consolidated Pools & Equipment Corp.*, 68 N.J.Super. 321, 329–30, 172 A.2d 246 (Ch.Div.1961) (unfair competition as "passing off"); 3 Callmann, Unfair Competition, Trademarks & Monopolies § 19.38 (4th ed. 1983) (trade dress infringement).

"Likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978). The Third Circuit has identified ten factors which should be considered in determining whether a likelihood of confusion exists:

(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Id.; see Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir.1983). While all of these factors may be relevant, they need not all be considered "when some are dispositive." *American Cyanamid Co. v. S.C. Johnson & Son, Inc.*, 729 F.Supp. 1018, 1021 (D.N.J.1989), *citing Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151–52 (3d Cir.1984). We will treat with each of the ten factors in turn.

### 1. Similarity of Marks

When considering the similarity of two marks, one must compare the appearance, sound and meaning of the marks, as well as the manner in which they are used. *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 824 (D.N.J.1980). In making such a comparison, the relevant factor is "the overall impression created by the mark as a whole rather than simply comparing individual features of the marks."[4] *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d F.2d 966, 975 (11th Cir.1983); *American Cyanamid Co.*, 729 F.Supp. at 1021. Similarity of the marks is merely one of the relevant factors, and it is not dispositive on the issue of likelihood of confusion. *See General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir.1987) ("The use of identical, even dominant, words in common does not mean that two marks are [confusingly] similar"); *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1555 (S.D.N.Y.1987); 3A Callmann, Unfair Competition, Trademarks & Monopolies §§ 20.07, 20.13.

Plaintiff's mark is simply TAJ MAHAL, and it is used as the name of an Indian restaurant in Washington, D.C. In contrast, defendants have named a large casino and hotel facility in Atlantic City the TRUMP TAJ MAHAL. The meaning of the term TAJ MAHAL appears to be dissimilar in plaintiff's restaurant and defendants' hotel and casino. In the context of

---

4. "[I]t would be incorrect for purposes of comparison to break down each mark to its simplest element or characteristic, for that is not the manner in which potential purchasers shop for the respective products of plaintiff and defendant.... In the marketplace, a potential shopper is confronted by a totality of circumstances which ought to be considered in determining whether there is a likelihood that confusion, mistake or deception will result. All relevant factors should be evaluated in their entirety as reflected by each mark and its respective product." *Johnson & Johnson v. Colgate–Palmolive Co.*, 345 F.Supp. 1216, 1222 (D.N.J.1972) (citation omitted); *see Or Da Industries, Ltd. v. Leisure Learning Products*, 479 F.Supp. 710, 716–17 (S.D.N.Y.1979).

plaintiff's restaurant, TAJ MAHAL may simply be indicative of Indian cuisine and a general Indian motif. Whereas, in defendants' facility, TAJ MAHAL may indicate grandeur, opulence and extravagance. Plaintiff contends that defendants' mark is just TAJ MAHAL, not TRUMP TAJ MAHAL. In support of this contention, plaintiff cites Mr. Mallick's affidavit in which he states that he has seen defendants employ the name TAJ MAHAL numerous times independent of the surname TRUMP. On the present motion for summary judgment, we will assume that defendants' mark is simply TAJ MAHAL. Therefore, defendants' mark clearly is similar to plaintiff's registered name.

### 2. *Strength of Plaintiff's Mark*

■ "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although a possibly anonymous, source." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). Accordingly, the strength of a mark depends on its distinctiveness and its "origin-indicating" quality. *Id.* The relative strength of any mark lies on a spectrum depending on whether the mark is generic, descriptive, suggestive or arbitrary and fanciful. *Id.; Kinark Corp. v. Camelot, Inc.*, 548 F.Supp. 429, 447 (D.N.J.1982). A mark is entitled to greater protection the further it lies towards the arbitrary end of the spectrum and the farther it gets away from the generic end. *See McGregor–Doniger, Inc.*, 599 F.2d at 1131.

A mark is suggestive if "it requires imagination, thought and perception to reach a conclusion as to the nature of the services." *Kinark Corp.*, 548 F.Supp. at 448, *quoting Stix Products, Inc. v. United States Merchants & Mfrs., Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968). The mark TAJ MAHAL is clearly suggestive in the food service, casino and guest accommodations markets because it takes some imagination to link those services with the name of a palatial crypt located in India.

■ In determining the strength of a suggestive mark, it is relevant to consider whether an "impoverishment of the language" of a given market would occur if a person were permitted to preclude any one else from using one of the only terms which instantly evokes a certain image or association. *Kinark Corp.*, 548 F.Supp. at 448; *see Telechron, Inc. v. Telicon Corp.*, 198 F.2d 903, 906 (3d Cir.1952). The term TAJ MAHAL brings to mind grandeur and opulence, and it is evocative of an exotic, Eastern flavor. While there are other terms that convey a similar impression, few engender the same images with the same panache as does the term TAJ MAHAL. Trademark protection is not intended to allow a person to procure a certain impression or association for his own exclusive use, and others must be permitted to communicate the same impression or association if they desire. *See Kinark Corp.*, 548 F.Supp. at 448–49. Therefore, a mark is relatively weak when it is suggestive, and when it is one of only a few terms which communicates a particular impression. *Id.*

■ In addition, the widespread use of a given mark by others weakens the mark and dilutes the plaintiff's protection. *Id.* at 448 ("[E]xtensive third-party use of the [mark was] impressive evidence that there would be *no* likelihood of confusion") (emphasis in original); *Nabisco Brands, Inc. v. Quaker Oats Co.*, 547 F.Supp. 692, 699 (D.N.J.1982). The term TAJ MAHAL has been used by numerous other restaurants and businesses in the United States over the past 25 years, and there are currently at least 24 restaurants by that name. Two of those restaurants are located in New Jersey.

### 3. *Prices of the Services and Other Factors Indicative of the Care and Attention Expected of Consumers When Making a Purchase*

The rationale behind this factor is that consumers will be less likely to be confused about the origin of goods or services when they are relatively expensive. The amount of care and attention attendant to a purchase increases proportionally as the cost

of the goods or services increase. *See Restaurant Lutece, Inc. v. Houbigant, Inc.*, 593 F.Supp. 588, 595 (D.N.J.1984); 3A Callmann, Unfair Competition, Trademarks & Monopolies §§ 20.09, 20.10.

In the present case, defendants' services include casino gambling, guest accommodations, food services and entertainment. It is also relevant that defendants' facility is located in Atlantic City, and many of its patrons seemingly would have to travel some distance in order to gamble, eat and stay there. The top suite at the TRUMP TAJ MAHAL rents for $10,000 per night, and the entire milieu surrounding defendants' establishment conjures a sense of outlandish expense and money, both spent and won.

4. *Length of Time Defendants Have Used Name TAJ MAHAL Without Evidence of Actual Confusion Arising*

While the TRUMP TAJ MAHAL only opened on April 2, 1990, the name TAJ MAHAL has been associated with the casino and hotel project since 1986. Defendants acquired the project in 1987, and they began advertising under the name TRUMP TAJ MAHAL in November 1988. The signs bearing the name TRUMP TAJ MAHAL were placed on the casino in October, 1988. No evidence of alleged actual confusion between the TRUMP TAJ MAHAL and plaintiff's TAJ MAHAL restaurant arose until late June 1990.

5. *Intent of Defendants in Adopting Name TAJ MAHAL*

■ A defendant's intent in adopting his mark is one of the most important factors when considering whether a likelihood of confusion exists between two marks. "[I]f a plaintiff can demonstrate that a defendant adopted a mark with the intent of obtaining unfair commercial advantage from the reputation of the plaintiff, then 'that fact alone may be sufficient to justify the inference that there is confusing similarity.'" *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1368 (D.N.J.1981), *quoting Amstar Corp.*, 615 F.2d at 263. In this regard, a defendant's awareness of the plaintiff's mark prior to defendant's

use of a similar mark is relevant. *Caesars World, Inc.*, 490 F.Supp. at 825.

There is absolutely no evidence that defendants adopted the name TRUMP TAJ MAHAL with the intention of preying on plaintiff's commercial reputation. Defendants only learned of plaintiff's TAJ MAHAL restaurant when their application for a registered service mark was refused in February 1989 and after they had used their designation for over two years and spent untold dollars promoting, advertising, and constructing their version of the TAJ MAHAL. While defendants technically did not put the name TRUMP TAJ MAHAL into commerce until April 2, 1990, it would be absurd to conclude that they had not previously used the name.

6. *Evidence of Actual Confusion*

Since likelihood of confusion is the dispositive issue in this case, it follows that evidence of actual confusion is significant. Plaintiff has submitted record evidence about eight individuals who have been confused about plaintiff's possible relationship to defendants' hotel and casino. One individual asked Mr. Mallick to help him get reservations at the TRUMP TAJ MAHAL, while another inquired with Mr. Mallick about getting a discount at the TRUMP TAJ MAHAL for a corporate junket. Two individuals simply stated that they thought plaintiff was related to defendants' enterprise in some way. The other incidents of confusion involved people who expressed concern to Mr. Mallick about his possible entanglement with defendant Donald Trump and his alleged financial difficulties.

■ When considering evidence of actual confusion, the key is whether there actually has been a diversion of customers from plaintiff to defendant. *See Sun Banks of Florida v. Sun Federal Savings & Loan*, 651 F.2d 311, 319 (5th Cir.1981); *Transfer Print Foils v. Transfer Print America*, 720 F.Supp. 425, 439 (D.N.J.1989) (purchase orders and payments sent to wrong party); 3A Callmann, Unfair Competition, Trademarks & Monopolies § 20.61. Some courts have found that mere inquiries into whether a connection exists between the parties are entitled to little weight. *Jordache En-*

*terprises, Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1487 (10th Cir.1987); *Vitek Systems, Inc. v. Abbott Laboratories,* 675 F.2d 190, 193 (8th Cir.1982); 3A Callmann, Unfair Competition, Trademarks & Monopolies § 20.61. "[S]tanding alone with no other evidence [customer inquiry evidence] is insufficient proof of actual confusion." *Jordache Enterprises,* 828 F.2d at 1487, *quoting* 2 J. McCarthy, Trademarks and Unfair Competition § 23:2(B) at 54 (2d ed. 1984). In addition to the type of evidence offered to show actual confusion, the number of incidents of such confusion is relevant in determining whether there is a likelihood of confusion between the parties' marks. *See Sun Banks of Florida,* 651 F.2d at 319; *Scott Paper,* 589 F.2d at 1231.

Plaintiff's evidence of actual confusion shows that some people have inquired about the relationship between plaintiff and defendants, and it fails to show that any potential customers of plaintiff's restaurant were actually diverted to defendants' hotel and casino due to their confusion. There is no evidence on the record that anyone has arrived in Atlantic City, eaten dinner at the TRUMP TAJ MAHAL, and then been surprised to find out that plaintiff did not own and operate the casino restaurant.

7. *Whether the Parties' Services Are Marketed Through the Same Channels and Advertised by the Same Media*

Plaintiff promotes its restaurant through advertisements in local Washington newspapers targeted at the Indian–American and Pakistani–American communities. Plaintiff also occasionally has handbills passed out at subway stations and places advertisements in restaurant guides, the telephone directory and magazines. It is clear that plaintiff's marketing and promotion efforts are limited to the Washington area. In contrast, defendants promote their casino and hotel through television and radio spots, as well as newspaper and magazine advertisements. Defendants focus their marketing efforts mainly on New Jersey and its contiguous states, especially on the Philadelphia and New York metro-politan areas. Defendants have advertised in Washington newspapers in the past, but they do not otherwise advertise their facility through any of the channels employed by plaintiff to promote its restaurant.

8. *Extent to Which Targets of the Parties' Sales Efforts Are the Same*

The main targets of plaintiff's sales efforts are people from the Washington area who are interested in Indian cuisine. There is no evidence that the targets of plaintiff's sales efforts are consumers from New Jersey or the Middle Atlantic region. The targets of defendants' sales efforts are conventions from all over the United States and people from throughout New Jersey, as well as Delaware, New York and Pennsylvania. As is the case with plaintiff, the targets of defendants' sales efforts roughly tracks the scope of their advertising and promotional campaigns. In addition, defendants target certain types of consumers not targeted by plaintiff, such as gamblers, convention-goers and theatre or show spectators. We note that defendants operate a hotel in one of the few spots where casino gambling is permitted in this country, and that Atlantic City is the only haven for gamblers on the East Coast. Therefore, defendants probably do target consumers in the Washington metropolitan area, albeit for different purposes than the provision of Indian food.

9. *Relationship of the Parties' Services in the Minds of the Public Because of the Similarity of Function*

There is no evidence of the relationship between the parties' services in the minds of the public because of the similarity of function.

10. *Other Factors Relevant to Whether the Consuming Public Might Expect Plaintiff to Provide Services in Defendants' Market*

Plaintiff has limited its operation to a single Indian restaurant in Washington for the past 25 years, seemingly without change. The record evidence indicates no suggestion that plaintiff might be expected to open a casino or hotel with an Indian motif. It further provides no indication that plaintiff might be expected to open

another TAJ MAHAL restaurant in New Jersey.

Plaintiff's services are limited solely to restaurant services, while defendants' services include casino gambling, guest accommodations, convention and conference services, and entertainment, as well as restaurant services. While there is evidence concerning the various restaurants located in the TRUMP TAJ MAHAL, there is no indication that defendants operate an Indian restaurant.

### B. Conclusion on Service Mark and Unfair Competition Claims

 In light of the relevant factors, no reasonable jury could conclude that there is a likelihood of confusion between plaintiff's restaurant and defendants' casino and hotel. Even assuming that both parties use the mark TAJ MAHAL, there is virtually no other evidence concerning a likelihood of confusion. The undisputed evidence indicates that quite a few other people use the name TAJ MAHAL, and many of them use it solely for restaurant services. It also shows that the expense and effort in enjoying defendants' facility are relatively high, and that consumers probably use some care and attention before going there. Plaintiff's mark is suggestive in nature, and it is one of only a few terms which vividly communicates impressions of grandeur and opulence. It is undisputed that the use of the name TAJ MAHAL on the Atlantic City casino predates defendants' involvement in the project, and that no confusion between the parties' interests arose until June 1990, over one and one-half years after defendants began advertising about their facility. There is no evidence that defendants adopted the name TAJ MAHAL with the intention of taking advantage of plaintiff's commercial reputation.

There is some evidence of actual confusion in the form of inquiries to Mr. Mallick about his personal relationship to the TRUMP TAJ MAHAL. However, the record provides no evidence that customers were diverted from plaintiff's restaurant because of their use of defendants' services

instead. It is undisputed that the parties advertise differently and generally target different geographic markets, although defendants do try to attract people from Washington, D.C. to their casino and hotel. With regard to restaurant services, there is no evidence that defendants target consumers who may alternatively go to plaintiff's restaurant. Many of the characteristics of defendants' enterprise support an inference that there is no likelihood of confusion between plaintiff's TAJ MAHAL and the TRUMP TAJ MAHAL. Such factors include the location of defendants' facility location in Atlantic City, the fact it is primarily a casino, its obvious and well known affiliation with defendant Donald Trump, and its overall exposure in the New Jersey–New York–Pennsylvania area.

Against this background, the similarity between the parties' marks and the few instances of actual confusion present merely a scintilla of evidence on the issue of a likelihood of confusion. From that scintilla of evidence, it is clear that no genuine issue of material fact exists on the record. *See Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the unlikeliness of confusion is apparent and overwhelming. Since the evidence is so one-sided that no reasonable jury could find that there is a likelihood of confusion, summary judgment is appropriate on plaintiff's claims for federal service mark infringement, federal false designation of origin, and state and common law unfair competition. *See Williams*, 891 F.2d at 460. Therefore, defendants' motion for summary judgment will be granted.

### IV. The Claim for Trade Dress Infringement

Trade dress is the overall visual impression attributable to a party's product or provision of services. *See Ciba–Geigy Corp. v. Bolar Pharmaceutical Co.*, 747 F.2d 844, 851 (3d Cir.1984), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985). Although the controlling issue is still the likelihood of confusion, we must consider the appearance of the parties' respective services, establishments and

sources of advertising and marketing in order to address plaintiff's trade dress infringement claim.

 In order to establish a claim for trade dress infringement, a party must show that its trade dress has acquired a secondary meaning, that the trade dress is non-functional, and that there is a likelihood of consumer confusion as to the source of the product or service bearing the imitated feature. *American Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1141 (3d Cir.1986). If a party is unable to prove any one of these three elements, it has failed to establish its claim. *Id.* With regard to this claim, the law of New Jersey parallels the federal law of unfair competition. *Id.; Ciba–Geigy Corp.,* 747 F.2d at 854 & n. 7.

 A party's trade dress has acquired a secondary meaning "when the purchasing public associates that dress with a single producer or source rather than just with the product itself." *LeSportsac, Inc. v. K-Mart Corp.,* 754 F.2d 71, 78 (2d Cir. 1985). A showing of secondary meaning may be unnecessary if the trade dress is inherently distinctive. *Vaughan Manufacturing Co. v. Brikam International, Inc.,* 814 F.2d 346, 348 (7th Cir.1987). In the present case, there is no record evidence to show that plaintiff's trade dress has a secondary meaning, or that it is inherently distinctive.

 The trade dress of a restaurant can include the appearance of the restaurant's exterior, the identifying signs and symbols, the interior floor plan, the decor, the serving equipment, and the server's uniforms. *Prufrock Ltd., Inc. v. Lasater,* 781 F.2d 129, 132 (8th Cir.1986) (collecting cases). The trade dress of plaintiff's TAJ MAHAL incorporates an Indian motif, images of the eponymous Indian mausoleum, the name TAJ MAHAL set out in stylized

print on signs, napkins and menus, and images of minarets. Such features are not inherently distinctive to plaintiff's restaurant, but they are common to many facilities with Indian themes. There is no evidence on the record that consumers associate these images with plaintiff's TAJ MAHAL alone, and it is hard to imagine that any such evidence exists. If there is any association between these items and plaintiff's restaurant, it is the recognition that they are associated with Indian restaurants in general.

In addition, much of plaintiff's trade dress appears to be functional. To create a demand for Indian cuisine and culture, it follows that a business's trade dress should engender images and impressions of things Indian. Accordingly, elements of a trade dress which relate to the concept or theme of a restaurant are functional as they enhance consumer demand for the restaurant's food. *See id.* at 134. In this regard, we must be concerned with placing limitations on the alternative ways to communicate and promote general themes and concepts. "[A]ny element of a restaurant's trade dress that advances the concept cannot be protected because those elements are related to the consumer demand for the concept." [5] *Id.*

Finally, we note that the existence of many other Indian restaurants, including other TAJ MAHALs, as well as the common use of the image of the original TAJ MAHAL negate "any realistic possibility that reasonably prudent consumers … would be likely to confuse" plaintiff's restaurant with defendants' hotel and casino, despite any resemblance in their trade dress. *See T.G.I. Friday's, Inc. v. International Restaurant Group, Inc.,* 405 F.Supp. 698, 708–09 (M.D.La.1975), *aff'd,* 569 F.2d 895 (5th Cir.1978). Since there is no evidence to create a genuine issue of material fact on plaintiff's trade dress in-

---

**5.** "If a trade dress that creates a chosen theme or concept could be protected, then others who wished to use the same concept would be severely limited in their ability to do so. Indeed, by protecting the trade dress that creates the concept, this court would be protecting the concept itself. As stated earlier, [plaintiff] cannot use [the law of unfair competition] to protect its interest in the core concept. [Plaintiff] is therefore not entitled to appropriate for itself a combination of features that is compatible with its 'core concept.' Instead, 'the interest in free competition permits [their] imitation.'" *Prufrock Ltd.,* 781 F.2d at 134.

fringement claim, summary judgment is appropriate. Defendants' motion for summary judgment on this claim will be granted.

## V. *The Motion to Dismiss Plaintiff's Punitive Damages Claim*

Defendants argue that plaintiff cannot recover punitive damages in this action as a matter of law. Because summary judgment will be granted in favor of defendants and plaintiff's complaint will thereby be dismissed, we need not address the defendants' motion to dismiss the punitive damages claim.

## VI. *The Motion for Attorneys' Fees*

■ Defendants argue that they are entitled to an award for attorneys' fees pursuant to the Lanham Act. They contend that the commencement of this case was unreasonable, and that plaintiff's failure to review the facts and law involved has caused defendants to incur unnecessary legal expenses.[6]

■ Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). When issuing an award of attorneys' fees, the court may require that the fee award be paid by the losing party's attorney and not the losing party itself. *Motown Productions, Inc. v. Cacomm, Inc.*, 849 F.2d 781, 786 (2d Cir. 1988). In light of the granting of the summary judgment motion, defendants clearly are the prevailing parties in this action. Therefore, the issue becomes whether this is an exceptional case so that the court may exercise its discretion to award attorneys' fees to defendants.

A case is exceptional if it is "groundless, unreasonable, vexatious or pursued in bad faith." *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 123 (8th Cir.1987); *see Noxell Corp. v. Firehouse No. 1 Bar–B–Que Restaurant*, 771 F.2d 521, 526 (D.C. Cir.1985). A case also is exceptional if it was brought for purposes of economic coercion. *Comidas Exquistos, Inc. v. Carlos McGee's Mexican Cafe, Inc.*, 602 F.Supp. 191, 199 (S.D.Iowa), *aff'd*, 775 F.2d 260 (8th Cir.1985). However, a showing of bad faith is not a prerequisite for an award of attorneys' fees. *Noxell Corp.*, 771 F.2d at 526. In authorizing awards of attorneys' fees for successful defendants, the Lanham Act is intended to "provide protection against unfounded suits brought by trademark owners for harassment and the like." S.Rep. No. 93–1400, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7132, 7136.

Based on the history of the present litigation, we cannot conclude that this is an exceptional case. While plaintiff has failed to present more than a mere scintilla of evidence to support its claims and summary judgment will be entered in favor of defendants, it is clear that plaintiff has a colorable claim. There is no indication that plaintiff filed suit in bad faith or with the intention of placing economic coercion on defendants. Mere suspicions about plaintiff's motivations will not suffice. After all, plaintiff does have a registered service mark for the name TAJ MAHAL, and it has used that name in conjunction with its Indian restaurant for the past 25 years. As we have discussed above, a few instances of confusion between plaintiff's restaurant and defendants' hotel and casino have arisen. Due to these facts, it is difficult to characterize plaintiff's decision to file suit as unreasonable or vexatious; descriptions such as unrealistic and overly optimistic may be more apropos. Accordingly, defendants' motion for an award of attorneys' fees will be denied.

An order consistent with this opinion has been entered.

---

**6.** At oral argument, plaintiff's sole argument against the award of attorneys fees was that a case brought by an owner of a registered mark could not conceivably be considered unreasonable or exceptional. As a general proposition, we disagree with plaintiff's argument. While the registration of the allegedly infringed mark may have some relevance, it does not resolve the question of attorneys' fees one way or the other. *See Motown Productions, Inc. v. Cacomm, Inc.*, 849 F.2d 781, 786 (2d Cir.1988); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 623 F.Supp. 21, 22 (D.Ariz.1985), *rev'd on other grounds*, 826 F.2d 837 (9th Cir.1987).

## ORDER

This matter having come before the court on defendants' motion for summary judgment, defendants' motion for dismissal of plaintiff's punitive damages claim, and defendants' motion for attorneys' fees pursuant to 15 U.S.C. 1117(a); and upon due consideration of the parties' arguments and submissions, and for good cause shown as set forth in the court's opinion of this date;

IT IS, on this 15th day of August, 1990,

ORDERED that defendants' motion for summary judgment is granted, and plaintiff's complaint is thereby dismissed; and

IT IS FURTHER ORDERED that defendants' motion for attorneys' fees is denied.