**BARRE–NATIONAL, INC., Plaintiff,**

v.

**BARR LABORATORIES, INC., Defendant.**

**Civ. A. No. 91–3214.**

United States District Court, D. New Jersey.

Sept. 10, 1991.

Ronald Gould, Shanley & Fisher, Morristown, N.J., and Stephen P.H. Johnson, John Donofrio, Lawrence J. Gotts, Kirkland & Ellis, New York City, for plaintiff.

John G. Gilfillan, III, Carella, Byrne, Bain & Gilfillan, Roseland, N.J., and Charles R. Brainard, Richard G. Kline, Edward T. Colbert, Kenyon & Kenyon, Washington, D.C., for defendant.

## OPINION

WOLIN, District Judge.

Before the Court is plaintiff's motion for a preliminary injunction, pursuant to Federal Rule 65, to restrain defendant from distributing liquid pharmaceuticals using defendant's own trademark. In accordance with Federal Rule 52, the Court sets forth herein its findings of fact and conclusions of law. For the reasons expressed below, the Court will deny plaintiff's motion.

## I. FACTUAL BACKGROUND

A. *Barre–National and Barr Laboratories*

Plaintiff Barre–National, Inc. ("Barre")[1], a corporation formed in 1949,[2] is engaged

---

**1.** "Barre" is pronounced "berry."

**2.** Barre Drug Company, Inc. was incorporated in 1949. It purchased National Pharmaceutical Manufacturing Company in 1967 and the name of the company was changed to Barre–National, Inc. in 1975.

in the manufacture, distribution and sale of generic liquid pharmaceutical. Barre has used the trademark, "BARRE," on nearly all of its liquid pharmaceuticals. The company name, Barre–National, Inc., also appears on Barre's products and is used in some advertisements. *See* Donofrio Aff., Ex. 5; Colbert Aff., Ex. 15. In some of its advertising, Barre refers to itself as a "leader in liquid pharmaceuticals" or "your partner in quality liquid pharmaceuticals." *See* Colbert Aff., Ex. 15; Altman Aff., ¶ 9.

Defendant Barr Laboratories, Inc. ("Barr") was incorporated in 1970. Barr manufactures, distributes and sells a variety of generic solid pharmaceuticals, including some powdered forms which are mixed and dispensed as liquids by pharmacists.[3] Since 1971, Barr has used the trademark "BARR" in connection with its products. Barr registered its mark as U.S. Trademark Registration No. 1,313,019 on January 8, 1985, with a claimed date of first use of November 1971. The trademark was issued to Barr for pharmaceuticals in "tablet and capsule form." Donofrio Aff., Ex. 2. The company name, Barr Laboratories, also appears on Barr's products and is used in advertising. *See* Cohen Aff., Ex. E; Cohen Aff., ¶ 18.

In 1989, Barr obtained registration for its stylized trademark "barr"[4] under U.S. Trademark Registration No. 1,566,713. This registration was for a full line of pharmaceutical preparations. Donofrio Aff., Ex. 3. Barr uses the stylized "barr" mark on its products and in its advertising. *See* Cohen Aff., Ex. E.

### B. *Barre's Trademark Application*

In April 1987, Barre filed an application to register its "BARRE" trademark, claiming April 1975 as the date of first use of the mark. Barre sought registration of its mark for broad classes of pharmaceuticals without specification of solid or liquid form. The Trademark Examiner denied registration based on Barr's prior registration and the fact that "Barre" was merely a surname. Donofrio Aff., Ex. 7. In further support of its application, Barre submitted an affidavit by its President, Max Mendelsohn, in which he states that both Barre and Barr had used their respective marks "for 16 or 17 years," and that he was "aware of no instance of actual confusion." Colbert Aff., Ex. 6.[5]

The Trademark Office again rejected Barre's application, based upon the likelihood of confusion with Barr's trademark. Donofrio Aff., Ex. 7. The Trademark Examiner explained that the two names were similar in sound and appearance and that confusion was likely because the companies both sold pharmaceuticals. Donofrio Aff., Ex. 7. He noted that both companies marketed their products in the wholesale drug market but that neither company sold to the ultimate consumer of the drug. Donofrio Aff., Ex. 7.

In response to the Examiner's decision, Barre subsequently contacted Barr and requested Barr's consent to Barre's trademark registration. Barre advised Barr that unless it agreed to Barre's registration, Barre would petition for cancellation of Barr's trademark registration. Kinder Aff., ¶ 5. After reviewing the situation, Barr provided Barre with an affidavit of consent, which Barre submitted in support of its application. Colbert Aff., Ex. 9. In this affidavit, Barr's president, Edwin Cohen, stated that the Barr and Barre names, with their different appearance and pronunciation, are readily distinguishable. Donofrio Aff., Ex. 7. In addition, he acknowledged that he knew of no instance of actual confusion between the two companies' products during the 18 year period in which both companies had used the marks. Donofrio Aff., Ex. 7. Barre also argued in

---

**3.** Barr has sold these powdered pharmaceuticals since 1984. An example of such a product is ethylsuccinate. Cohen Aff., ¶ 14.

**4.** Barr's stylized trademark, "barr," uses a hexagon for the bottom part of the lower-case "b," suggesting a chemical configuration. *See* Donofrio Aff., Ex. 3.

**5.** The affidavit also explained that Barre was not merely a surname but the name of a Baltimore street on which the company's headquarters was located. Donofrio Aff., Ex. 7.

its response to the Trademark Examiner's decision that confusion between the two trademarks was unlikely because Barre sold liquid pharmaceuticals whereas Barr marketed solid products. Kinder Aff., ¶ 6, 9.

Barre also submitted a second affidavit from Barre's President, Max Mendelsohn, in which he stated that Barre marketed its products to "sophisticated customers," primarily full-line wholesalers (who sell numerous items to drugstores), generic drug distributors (who sell to pharmacies and drug store chains), and chain drug stores. Donofrio Aff., Ex. 7.

In February 1989, the Trademark Examiner approved registration without issuing an opinion. Barre's trademark was registered as U.S. Trademark Registration No. 1,538,832 on May 16, 1989. Donofrio Aff., Ex. 1.

### C. Generic Pharmaceutical Marketing and Distribution

"Generic" pharmaceuticals are pharmaceuticals that are chemically equivalent to a name-brand drug, such as Ilosone, but sold under a generic name, such as erythromycin estolate. All generic drugs, corresponding to one particular brand-name drug, have the same generic name, regardless of the company which manufactures them. Thus, all generic forms of the name-brand drug Ilosone have the generic name erythromycin estolate. Generic drugs are generally available at a lower cost than name-brand pharmaceuticals.

Generic prescription drugs are generally dispensed by a pharmacist and presented to the patient in a container bearing only the pharmacist's label. Often, the manufacturer's label is actually covered up by the pharmacist's label. Thus, the ultimate consumer of the generic pharmaceutical ordinarily does not know the identity of the drug's manufacturer. See, e.g., Colbert Aff., Ex. 1. Prescription liquids are less likely to bear a generic manufacturer's name or mark, since, unlike tablets, it is impossible to mark the product itself.

Pharmacists typically stock only a single generic product corresponding to a particular brand-name drug because each generic pharmaceutical is chemically equivalent, according to government standards. Cohen Aff., ¶ 11. For instance, it would be unlikely that a pharmacist would have both Barre and Barr's erythromycin estolate on hand at the same time.

Most pharmacists order pharmaceuticals from drug wholesalers, rather than directly from the manufacturer. Cohen Aff., ¶ 10. In placing these orders, the pharmacist is likely to use the wholesaler's catalogue number for the particular product. Cohen Aff., ¶ 26. Chain drug stores are generally supplied by a central purchasing warehouse which selects the generic products. Cohen Aff., ¶ 12.

Occasionally, pharmacists may also use a publication known as the Drug Topics Red Book (the "Red Book"),[6] or similar publications, to identify particular pharmaceuticals. Altman Aff., ¶ 17. Each pharmaceutical sold in the United States is identified by a specific identification number (NDC number), which is unique to that drug and its manufacturer. Altman Aff., ¶ 21. When using the Red Book to order pharmaceuticals, the purchaser provides the wholesaler, purchasing agent or manufacturer's representative with the NDC identification number. Altman Aff., ¶ 22. In the Red Book, liquid and solid pharmaceuticals are not listed separately. Cohen Aff., Ex. H. The Red Book abbreviates the names of the two companies as "Barr" and "Barre" and the two companies are listed next to each other, in alphabetical order, under the name of a product which they both sell. Cohen Aff., Ex. H. For instance, in the 1988 Red Book, under the drug "acetaminophen with codeine," Barr's listing for a solid version of the drug appears directly above Barre's liquid version. Cohen Aff., Ex. H. Other publications, such as the FDA's listing of approved pharmaceuticals, abbreviates Barre's name as "Barre–Nat'l." Colbert Aff., Ex. 13.

Both Barre and Barr follow usual industry practices in marketing their generic

---

6. The Red Book also contains a variety of other information. See Cohen Aff., Ex. H.

drugs. They advertise primarily to drug wholesalers, chain drug stores and pharmacists, rather than physicians who may specify a prescription drug by the manufacturer's brand name. Donofrio Aff., Ex. 7; Cohen Aff., ¶ 5.

### D. *Barr's Plans to Sell Liquid Pharmaceuticals*

In 1979, Barr filed an initial application for approval from the Food and Drug Administration (FDA) for manufacture of erythromycin estolate in liquid form. Cohen Aff., ¶ 6. Barr reactivated the application in January 1987 by filing supplemental information. Cohen Aff., ¶ 7. Barr received FDA approval for the drug in October 1990 and began distributing the drug in January 1991. Cohen Aff., ¶ 7.

During the fall of 1990, or at the latest, in January 1991, Barre learned of Barr's plans to distribute erythromycin estolate in liquid form, using the Barr trademark ("barr") and trade name. Cohen Aff., ¶ 8; Altman Aff., ¶ 11.[7] Barre sells erythromycin estolate as a liquid. In February 1991, Barre wrote to Barr stating that Barr's marketing of erythromycin estolate could cause confusion with Barre's product. Donofrio Aff., Ex. 8. From February to April 1991, the parties engaged in further correspondence concerning Barr's marketing of the new product under the Barr name. Donofrio Aff., Ex. 10–14.

In July 1991, Barre filed this suit against Barr alleging federal and state claims of trademark infringement and unfair competition. Simultaneously with filing the Complaint, Barre sought an order to show cause as to why a preliminary injunction should not issue restraining Barr from entering the liquid pharmaceutical market. The Court granted the order to show cause and held oral argument on plaintiff's motion for a preliminary injunction.[8]

## II. DISCUSSION

### A. *Standard for a Preliminary Injunction*

■ When ruling on a motion for a preliminary injunction pursuant to Federal Rule 65, a district court must consider four factors: (1) the likelihood that the applicant will prevail on the merits at final hearing; (2) the extent to which plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 191–92 (3d Cir.1990). Only if the movant produces evidence sufficient to convince the court that all four factors favor preliminary relief should the injunction issue. *Id.* at 192. The Court thus will consider each factor separately.

### B. *Likelihood of Success on the Merits*

Barre's Complaint contains five counts which may provide the basis for a preliminary injunction: (1) federal trademark infringement under 15 U.S.C. § 1114 (Count One); (2) false designation of origin under 15 U.S.C. § 1125(a) (Count Two); (3) common law trademark and trade name infringement (Count Three); (4) common law unfair competition (Count Four); and (5) unfair competition under N.J.S.A. 56:4–1 (Count Five).[9]

*Williams v. Curtiss–Wright Corp.*, 681 F.2d 161, 163 (3d Cir.1982); *accord Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3d Cir.1990). The Court has decided this motion based on the affidavits and exhibits submitted without an evidentiary hearing, and resolved all relevant factual disputes on the evidence presented.

---

**7.** The parties dispute the actual date when Barre became aware of Barr's intention to market the liquid pharmaceuticals. Barr claims that Barre knew in 1988 that Barr had plans to manufacture liquid pharmaceuticals. Hanley Aff., ¶ 4.

**8.** Federal Rule 65 does not make a hearing a prerequisite for ruling on a preliminary injunction. Fed.R.Civ.P. 65(a). The Third Circuit has recognized that a preliminary injunction may be resolved "on the basis of affidavits and other written evidence, without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue."

**9.** Barre also asserts Count Six for cancellation of Barr's federal trademark registration. This count does not support the issuance of a preliminary injunction.

■ Federal Trademark Infringement

■ To succeed on a trademark claim, a plaintiff must establish that (1) the mark is valid and legally protectable; (2) plaintiff owns the mark and; (3) defendant's use of the marks to identify goods or services is likely to create confusion about the origin of the goods or services. *Id.* *See also Pedi–Care, Inc. v. Pedi–A–Care Nursing, Inc.*, 656 F.Supp. 449, 453 (D.N.J.1987); *Holiday Inns, Inc. v. Trump*, 617 F.Supp. 1443, 1464 (D.N.J.1985).

■ Federal registration of the Barre trademark is *prima facie* evidence of the validity of the registered mark and of the registrant's ownership of the mark. *Pedi–Care*, 656 F.Supp. at 453. Barr does not dispute that Barre owns the trademark for the Barre name and that Barre's federally-registered mark is legally protectable. Thus, Barre has satisfied the first two elements of federal trademark infringement. The Court will focus on the third element of trademark infringement.

### a. *Likelihood v. Possibility of Confusion*

Barre next must demonstrate the likelihood of consumer confusion about the source of its pharmaceuticals. The Third Circuit has stated that when a newcomer enters a field already occupied by a trademark owner, the standard is lowered to a "possibility of confusion." *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1065 (3d Cir.1991); *Telechron, Inc. v. Telicon Corp.*, 198 F.2d 903, 908–09 (3d Cir.1952).[10] The meaning of "field" is thus important in determining whether the appropriate standard should be the "likelihood" or "possibility" of confusion.

■ Barre asserts that the Court should apply the possibility of confusion standard because Barr is a newcomer to the liquid pharmaceuticals market. Barre claims that it has been established in the liquid pharmaceuticals area for more than thirty years, while Barr has only recently entered this business. The Court must decide if Barr entered a new "field" of business by marketing erythromycin estolate in liquid form.

In *Country Floors*, the Third Circuit directed a district court, on remand, to determine the relevant market for the purpose of applying the possibility of confusion standard. In dicta, the court suggested that geographical location was an important consideration in evaluating whether the alleged infringer entered the territory of an established business. *Country Floors*, 930 F.2d at 1065. The court observed that the plaintiff company had an established floor-tile business in the Philadelphia area for 14 years, whereas the alleged infringer had operated stores in the Delaware Valley for only seven years and had opened a store in Philadelphia only two years prior to the lawsuit. *Country Floors*, 930 F.2d at 1065.

In the original case establishing the possibility of confusion standard, however, the Third Circuit focused on the similarity between the two trade names and the goods sold by each corporation. *Telechron*, 198 F.2d at 908–09. In *Telechron*, the plaintiff corporation had planned to market a clock radio under the "Telechron" name in 1940 and the product appeared on the market in 1946. *Telechron*, 198 F.2d at 908. Defendant first began selling radio and television sets under the name "Telicon" in 1946. The court commented that a newcomer must "stay clearly away from the original mark." *Id.* The court also found that radio and television sets and electric clocks were "all within a common merchandising field and likely to be found in the same store or stores similarly specializing in electrical appliances." *Id.* at 909. The court apparently determined that the defendant had newly entered the field of selling household electrical appliances.

In dicta, two district courts have given a broad construction to the concept of field for the purpose of applying the possibility of confusion standard. Both courts, however, did not rely on the possibility of confusion standard because the plaintiff had

---

**10.** The court has not explained the policy or rationale underlying this principle. 2 J. McCarthy, *Trademarks and Unfair Competition*, § 23.1 (2d Ed.1984 and 1990 Supp.).

demonstrated the likelihood of confusion. In *Blumenfeld Development Corp. v. Carnival Cruise Lines, Inc.*, 669 F.Supp. 1297 (E.D.Pa.1987), for 15 years, the plaintiff had been operating "Carnival" cruise ships, which emphasized on-board entertainment including a casino. *Id.* at 1301. About four years prior to the litigation, the defendant corporation began planning the development of a hotel and casino, using the name "Carnival." *Id.* at 1308–09. The court found that the defendant had recently entered a field, *i.e.*, the entertainment industry, that had been long occupied by Carnival. *Id.* at 1319.

Similarly, in *Dominion Bankshares Corp. v. Devon Holding Co.*, 690 F.Supp. 338 (E.D.Pa.1988), the court found the possibility of confusion standard applicable. In that case, the plaintiff had used its trade name, "Dominion Bank," for its banking services for 17 years primarily in Virginia, Maryland and the District of Columbia. *Id.* at 341. At the time of the lawsuit, defendants planned to operate a commercial bank in Pennsylvania, using the name "Dominion Bank." *Id.* at 342. The court apparently decided that the defendant was a newcomer in the field of banking services that had been long-occupied by the plaintiff. *Id.* at 345.

This Court will not apply the possibility of confusion standard in this case. Both Barre and Barr have been established pharmaceutical manufacturers for long periods: Barre for more than 30 years and Barr for more than 20 years. Barre has used its mark at least since 1975, possibly earlier,[11] whereas Barr has used its mark since 1971. First, Barr can hardly be said to be a newcomer to the pharmaceuticals industry.[12] Second, the Court declines to recognize liquid pharmaceuticals as a separate

field. The Court agrees with the Trademark Examiner's conclusion that both companies operate in the same channels of trade and sell identical or nearly identical products, irrespective of their solid or liquid form.[13] Acknowledging a market area of liquid pharmaceuticals would require this Court to construe the concept of "field" far too narrowly. Third, it would be difficult to define a market of liquid pharmaceuticals, since some solid products can be dissolved and dispensed as liquids by pharmacists. While Barre has sold liquid pharmaceuticals exclusively, Barr has sold powdered products which pharmacists mix and dispense as liquids, since 1984. Finally, because both companies market their products nationally, Barr has not invaded a particular geographical territory dominated by Barre. Since Barr cannot be deemed a newcomer to a field occupied by Barre, the Court will not apply the possibility of confusion standard.

### b. *Likelihood of Confusion*

Having determined the appropriate standard, the Court will focus on whether Barre can establish that the use of both marks on liquid pharmaceuticals creates a likelihood of confusion about the source of the products. Generally, if the overall impression created by the marks is the same, the marks are probably confusingly similar. *Opticians Ass'n*, 920 F.2d at 195. Where the owner of a trademark and the infringer "deal in competing goods or services, the court rarely need look beyond the mark itself. In those cases the court will generally examine the registered mark ... and compare it against the challenged mark." *Id.* at 195 (quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir.1983)). The plaintiff need not prove

---

11. In its trademark application, Barre's claimed date of first use for its mark is 1975. Donofrio Aff., Ex. 7. However, the affidavit of Max Mendelsohn, submitted with the application, suggests an earlier date of first use in the late 1960's. Donofrio Aff., Ex. 7.

12. The Trademark Examiner, in processing Barre's original application for registration, apparently considered the market to be pharmaceuticals in general, when he initially refused Barre's registration. In his opinion, the Trade-

mark Examiner explained that because both companies sold pharmaceuticals primarily to drug wholesalers, it was likely that using similar names would cause confusion about the actual source of the products. Colbert Aff., Ex. 7.

13. Because the Trademark Examiner did not issue an opinion when he approved Barre's registration, it is unclear whether he accepted Barre's later distinction between liquid and solid products or was persuaded by Barr's consent to registration.

actual confusion, but merely the likelihood of confusion. *Opticians Ass'n*, 920 F.2d at 195.

An initial examination of Barre's and Barr's marks, as they appear on products and in advertisements, do not convey the same overall impression. In addition to different spellings and pronunciations, Barr uses its stylized "b" or "barr" mark, which creates a different impression than Barre's name. The Court, therefore, must consider other factors in evaluating likelihood of confusion.

A myriad of factors may be considered in determining whether a likelihood of confusion exists, including:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods ... are marketed through the same channels of trade and marketed through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 293 (3d Cir.1991); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978); *CPC Int'l, Inc. v. Caribe Food Distributors*, 731 F.Supp. 660, 664–65 (D.N.J.1990).

As the Third Circuit has explained, likelihood of confusion "should be determined from the perspective of an ordinary consumer of the goods or services." *Ford Motor Co.*, 930 F.2d at 293 (*quoting Dominion Bankshares Corp.*, 690 F.Supp. at 345). The degree of caution used by these consumers depends on the relevant buying class. *Ford Motor Co.*, 930 F.2d at 293. Some buyer classes, such as professional buyers or consumers of very expensive goods, will be held to a higher standard of care than others. *Id.* Since persons who order generic pharmaceuticals from the manufacturer includes only industry professionals, such as pharmacists and drug wholesalers, the buying class could be expected to exercise a high standard of care.[14]

### c. *Similarity and Strength of the Marks*

Barre argues that the similarity between the two names creates a substantial likelihood of confusion. On their face, the names Barre and Barr are differentiated by the additional "e" in Barre. Although Barre and Barr are pronounced differently, this might not be apparent to a reader unfamiliar with the two companies. Barr's stylized "barr" mark aids the viewer in distinguishing between the marks. However, the marks therefore exhibit a substantial degree of similarity in their appearance and possibly sound.

Barre's mark demonstrates strength in its association with Barre's liquid pharmaceutical products.[15] "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Taj Mahal Enterprises, Ltd. v. Trump*, 745 F.Supp. 240, 248 (D.N.J.1990) (*quoting, McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979)). Accordingly, the strength

---

**14.** However, where the buyer class consists of both professional buyers and ordinary consumers, then the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class. *Ford Motor Co.*, 930 F.2d at 293.

**15.** Barre's mark, however, has not become "incontestable" within the meaning of the Lanham Act. *See* 15 U.S.C. §§ 1058 and 1065.

of a trademark "depends on its distinctiveness and 'origin-indicating' quality." *Taj Mahal Enterprises*, 745 F.Supp. at 248. The relative strength of any mark lies on a spectrum depending on whether the mark is generic, descriptive, suggestive, or arbitrary and fanciful. *Id.* A mark receives greater protection the further it lies towards the arbitrary end of the spectrum and the farther it lies away from the generic end. *Id.*

Barre's mark would originally have been characterized as a fairly weak, or descriptive, mark because it would be recognized primarily as a surname. 2 J. McCarthy, *Trademarks and Unfair Competition*, § 13 (2d Ed.1984 & 1990 Supp.). Although Barre was chosen as a corporate name because the original Barre Company was located on Barre Street,[16] Barre is likely to be viewed as a surname rather than a geographical term. *Id.* However, because "Barre" has been used by Barre on its pharmaceuticals for at least 16 years, "Barre" has become associated with products from the Barre–National Company. The company also uses the name "Barre–National" on its products and in advertisements. Because Barre has used its "Barre" mark in connection with its products for a long period and the mark clearly identifies Barre as the source of the goods, the mark is entitled to a significant degree of protection within the pharmaceutical industry.

#### d. *Marketing Channels*

Both Barre and Barr sell their products to the same groups of customers: drug wholesalers, chain drug stores and pharmacists. Altman Aff., ¶ 13. Both companies direct their sales efforts at these professionals and advertise in trade publications. This factor weighs in favor of finding a likelihood of confusion.

#### e. *Type of Goods and Purchasers*

An evaluation of the price and type of goods, pharmaceuticals, suggests that persons involved in ordering drugs, such as drug wholesalers, chain drug stores and pharmacists, would employ exceptional care in purchasing a particular product.[17] Barre's President has stated that Barre markets its products to "sophisticated consumers." Donofrio Aff., Ex. 7. Purchase of the incorrect product has potentially disastrous consequences. Persons ordering pharmaceuticals are not only sophisticated consumers, familiar with pharmaceutical manufacturers, but have an added duty by virtue of their occupation to use care when ordering pharmaceuticals.

In addition, those who order pharmaceuticals, by necessity, are experienced in distinguishing between the names of products which look and sound alike, and have long and complicated spellings. For instance, a brief review of the Health and Human Services Department's list of approved prescription drug products, revealed names such as chlordiazepoxide hydrochloride, chlorpheniramine maleate, chlorpromazine hydrochloride, and chlorpropamide. *See* Colbert Aff., Ex. 13. An individual capable of making such distinctions also would likely be able to distinguish between Barre and Barr as manufacturers.[18] Finally, orders, especially those to restock products, are often placed solely by the specific identification number for a product, rather than the name of the manufacturer. These factors weigh strongly against a finding of likelihood of confusion.

Other courts have reached similar conclusions. In *Astra Pharmaceutical Products, Inc. v. Beckman Instruments*, 718 F.2d 1201 (1st Cir.1983), the court found that the sophistication of the class of prospective purchasers (buyers of pharmaceuticals and medical equipment) was the "most critical factor that weighed against

---

**16.** Barre Street was named after Colonel Isaac Barre, a British Colonel. Donofrio Aff., Ex. 7.

**17.** Barre argues that stock clerks might order pharmaceuticals. Altman Aff., ¶¶ 24, 25. However, they would likely only be restocking products according to code numbers. Barre has not presented any evidence that stock clerks fre-

quently place new orders with drug manufacturers, such that they would need to distinguish between Barre and Barr.

**18.** Of course, a person might be paying more attention to the name of the drug, which has important consequences, than to the name of the manufacturer, which has less significance.

[the plaintiff]" in its trademark infringement claim. *Id.* at 1206. The court observed that it was "simply inconceivable that purchasers of the parties' products could be confused as to the source of these products." *Id.* at 1207. Similarly, in *Blue Bell Bio/Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1260 (5th Cir.1989), the court determined that medical professionals are likely to exercise a high degree of care in purchasing medical carts, and this factor weighed against a finding of likelihood of confusion.

### f. Evidence of Actual Confusion

Another relevant factor is evidence of actual confusion. In this case, the most salient evidence points to the absence of actual confusion between the Barre and Barr names. In support of Barre's trademark registration application, the presidents of *both* companies, Edwin Cohen and Max Mendelsohn, submitted sworn affidavits that they knew of no instance of actual confusion in at least 16 years during which both companies sold pharmaceuticals, including some identical generic drugs.

Barr also sells solid products, identical to Barre's, in a form by which they could be dissolved into liquids and sold by pharmacies in liquid form to customers. The two products would thus have been listed, one after the other, in the Red Book used by wholesalers and pharmacists to order pharmaceuticals. Based on the affidavits submitted in connection with Barre's trademark registration, Barr and Barre did not believe that use of both names on the same generic drugs (even though in different substantive forms) caused confusion.

Use of similar marks for a substantial period of time with no confusion among consumers may create a presumption that there is little likelihood of confusion. *Pignons S.A. de Mecanique v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir.1981); *Oreck Corp. v. U.S. Floor Systems, Inc.,* 803 F.2d 166, 173–74 (5th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); *Greentree Laborato-*ries, Inc. v. G.G. Bean, Inc., 718 F.Supp. 998, 1002 (D.Me.1989). While the Third Circuit has not considered this issue, and the Court will not apply a presumption here, it notes that the absence of confusion between Barr's and Barre's marks on similar products during at least 17 years of concurrent use, weighs heavily against a finding of likelihood of confusion.

The only other evidence of actual confusion between the two companies is the FDA's inspection of both corporations in 1989. Donofrio Aff., Ex. 6. Apparently, Barre was scheduled for an inspection, but allegedly because the inspector could not read a fellow employee's handwriting, both companies were inspected. Donofrio Aff., Ex. 6. However, Barr asserts that the FDA inspection was done in retaliation for the appearance of its president before the Congressional Subcommittee on Oversight and Investigation on that same day. Donofrio Aff., Ex. 6. Since this error did not involve confusion by a pharmaceutical purchaser of the two manufacturers or its products, it has limited value in demonstrating the likelihood of confusion. *See Incorporated Publishing Corp. v. Manhattan Magazine,* 616 F.Supp. 370 (S.D.N.Y.1985), *aff'd,* 788 F.2d 3 (2d Cir. 1986). ("Anecdotal evidence" of misdirected telephone calls and inquiries is not impressive because it is not proof of confusion between consumers contemplating a purchase and similarity of marks alone may not have prompted these events). As noted in *Taj Mahal Enterprises,* when considering evidence of actual confusion, the key is whether there is actually a diversion of customers from plaintiff to defendant. *Taj Mahal Enterprises,* 745 F.Supp. at 249 (court found evidence of inquiries about the relationship between the two companies was not convincing evidence of actual confusion).

However, Barre has also submitted a study which purports to demonstrate that a high percentage of pharmacists, when using simulated Red Book pages, confused "Barre" and "Barr." *See* Neadle Aff.[19]

---

**19.** The survey asked a random sample of pharmacists to view a card with a generic product, a dosage and a manufacturer and, after the card was taken away, to select the corresponding

This study, however, has several major flaws which minimize its probative value.[20] *See* Lieberman Aff. The Court will accord little weight to Barre's survey. *See Transfer Print Foils, Inc. v. Transfer Print America, Inc.,* 720 F.Supp. 425, 432–33 (D.N.J.1989) (court declined to accord great weight to a survey about consumer interpretation of a trade name due to its major design defects). Thus, Barre's meager evidence of actual confusion, combined with the parties' agreement that *no* actual confusion has occurred during a significant period when the parties both used the marks on identical products, weighs against finding a likelihood of confusion.

### g. *Other Factors*

Barre has not presented any evidence that Barr intended to create confusion with Barre's products in using its trade name on its liquid product. Nor can the Court discern any motive for Barr to attempt to create confusion with Barre's products. Both companies are well-known pharmaceutical manufacturers and both have approximately equal volumes of sales.

### h. *Evaluation of the Factors*

■ After a consideration of the relevant factors, the Court finds that Barre has not sufficiently demonstrated that pharmacists are likely to confuse the Barr and Barre liquid products. Despite the similarity between the marks and the parties' distribution of the same products through similar marketing channels, two factors are critically important to the Court's conclusion that Barre has not established a likelihood of confusion: (1) the care and sophistication exercised by the professional purchasers of pharmaceuticals, and (2) the absence of actual confusion during at least 16 years of concurrent use of the two marks on nearly identical products. Therefore, Barre has not established a likelihood of success on the merits on its trademark infringement claim, and is not entitled to a preliminary injunction.

The Third Circuit's entry of a preliminary injunction on a trademark infringement claim in *Opticians Ass'n* is distinguishable from this case because *Opticians Ass'n* acknowledged a likelihood of confusion where two associations were using identical marks. *Id.* at 195. However, in two recent cases, other courts in this district have found a likelihood of confusion between two similar, but not identical, trademarks. In *Specialty Measurements, Inc. v. Measurement Systems, Inc.,* 763 F.Supp. 91 (D.N.J.1991), the court determined that use of the mark "MSI" created the likelihood of confusion with the mark "SMI," supporting the entry of a preliminary injunction. The two companies sold

identification number from simulated pages from the Red Book. The study indicated that 57% of respondents correctly identified Barre's product code for erythromycin estolate, while 33% chose Barr's produce code. Ninety percent and 91% of respondents correctly selected the product code for two other products with different manufacturers. *See* Neadle Aff.

**20.** Barr points out several problems with Barre's survey. First, the pharmacists were not adequately screened to determine whether they use the *Red Book* to order pharmaceuticals by product codes or merely to look up other information, and whether they actually selected particular products for their store or merely restocked existing drugs. Lieberman Aff., ¶ 12.

Second, the conditions of the study were significantly different from a normal ordering process: within a short time span, the pharmacist was asked to look at a card, the card was taken away from him, and he was instructed to look up the item in the *Red Book.* Such guess work would be unlikely under normal ordering conditions. Lieberman Aff., ¶ 14.

A substantial percentage of pharmacists even selected the wrong product; 15% for the Barre end and 6% and 7% for the other product cards. This would be unlikely under realistic conditions. Lieberman Aff., ¶ 17. Finally, the presentation of the cards was biased. Barre's card was always the first card given to the respondent. Neadle Aff., Ex. 1. Respondents were not told that the card would be taken away before they were required to look up the item's product code. Neadle Aff., Ex. 1. Unfamiliarity with the task could certainly have caused greater confusion with the first card. Lieberman Aff., ¶ 19. By the time the respondents were given the second card, they knew the format of the task and that they needed to memorize the information on the card because they would not be allowed to see it again. Lieberman Aff., ¶ 20.

In addition, the instructions were different for Barre's card, as compared with the second and third cards. For cards two and three, the respondent was *told* to look at the card. For card one, the respondent was merely handed the card. Neadle Aff., Ex. 1.

similar products, transducers, to the same type of customers. Measurement Systems, Inc. (MSI) was created by a former employee of Specialty Measurements, Inc. (SMI). The court noted that the two marks looked and sounded alike and stressed that the transposition of the letters increased the likelihood of confusion." *Id.* at 95.

In *CPC Int'l,* the court found that the name "Mazorca" was confusingly similar to "Mazola," when used to sell identical products, corn oil. *CPC Int'l,* 731 F.Supp. at 666. However, the court determined that "La Mazorca" would not create a likelihood of confusion with "Mazola" and entered a preliminary injunction requiring defendant to use "La" with "Mazorca." *Id.* at 670.

### (2) False Designation of Origin, Common Law Trademark Infringement and Unfair Competition Claims

■ In order to succeed on any of its other claims, Barre must show a likelihood of confusion between the products marketed under the two trade names. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a federal cause of action for unfair competition and trade name infringement. *Country Floors,* 930 F.2d at 1064. To prevail on this claim, Barre must show that there is likely to be confusion as a result of Barr's false designation of origin, description or representation. *Id.*

■ As for Barre's common law claims, the test for common law trademark infringement is the same as for federal trademark infringement, *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1366 (D.N.J.1981), and the standards for common law and statutory unfair competition are the same as those for a claim under § 43(a) of the Lanham Act. *SK & F Co. v. Premo Pharmaceutical Labs, Inc.,* 625 F.2d 1055, 1065 (3d Cir.1980). Since the Court has already determined that Barre has not adequately demonstrated the likelihood of confusion, Barre cannot establish a likelihood of success on the merits of these claims.

## C. *Irreparable Injury*

The second factor the Court must evaluate on a preliminary injunction motion, whether the plaintiff will be irreparably injured if the injunction is not granted, does not support the issuance of an injunction in this case. "[W]here the plaintiff makes a strong showing of likely confusion, irreparable injury follows as a matter of course." *Opticians Ass'n,* 920 F.2d at 196–97. The irreparable harm in trademark infringement stems from the trademark owner's "lack of control [over the infringer's products] which potentially might result in a damaged reputation." *Opticians Ass'n,* 920 F.2d at 195.

■ In this case, Barre has not established the likelihood of confusion and therefore, irreparable injury will not be presumed. Since Barre's claim of irreparable injury rests exclusively on the loss of quality control and good will resulting from confusion with Barr's products, if there is no likelihood of confusion, it follows that Barre will not be irreparably harmed if an injunction is not entered against Barr's sale of liquid pharmaceuticals.

Because the Court has found that Barre has not demonstrated that it is likely to succeed on the merits or will suffer irreparable injury if an injunction is not entered, the Court need not consider the remaining third and fourth factors.

## III. CONCLUSION

For the reasons expressed above, the Court will deny plaintiff's application for a preliminary injunction, pursuant to Federal Rule 65.